# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

May 28, 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| Julio Cesar SARABIA | ) | |
| Michael William HUTCHISON III | ) | |
| Jose Miguel HERNANDEZ JR | ) | 2:24-mj-0070 DB |
| Mulan Precious KEOPHIMANH | ) | |
| Johnny Bobby TRUONG | ) | |
| Guadalupe Manuel CERVANTES | ) | |
| Tanya Duerelle LAWSON | ) | |
| *Defendants* | ) | |

**SEALED**

## CRIMINAL COMPLAINT

VIOLATION alleged as to all Defendants:

- Conspiracy to Distribute and Possess with Intent to Distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1).

Specific allegation as to all Defendants:

- Between on or about January 26, 2023, and continuing to the present, the defendants Julio Cesar SARABIA, Michael William HUTCHISON III, Jose Miguel HERNANDEZ JR, Mulan Precious KEOPHIMANH, Johnny Bobby TRUONG, Guadalupe Manuel CERVANTES, and Tanya Duerelle LAWSON, are engaged in an ongoing conspiracy with each other and others known and unknown, to distribute and possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1).

This criminal complaint is based on these facts:
**Please see attached Affidavit, incorporated here by reference.**

/s/ Sixto Torres

*Complainant's signature*

DEA Task Force Officer Sixto Torres

*Printed name and title*

This was sworn and signed before me telephonically.

Sworn to me over the telephone and SIGNED by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this
28    day of May 2024.

City and state:     Sacramento, California

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

## AFFIDAVIT OF DEA TASK FORCE OFFICER SIXTO TORRES IN SUPPORT OF CRIMINAL COMPLAINT

1.    I, Sixto Torres, Drug Enforcement Administration ("DEA") Task Force Officer, being duly sworn, hereby state:

### SCOPE OF REQUESTED CRIMINAL COMPLAINT

2.    This affidavit is submitted in support of a Criminal Complaint and arrest warrants for the individuals listed below based upon their ongoing violation of federal law, as detailed below.

3.    Defendants

    i.    Julio Cesar SARABIA
    ii.    Michael William HUTCHISON III
    iii.    Jose Miguel HERNANDEZ JR
    iv.    Mulan Precious KEOPHIMANH
    v.    Johnny Bobby TRUONG
    vi.    Guadalupe Manuel CERVANTES
    vii.    Tanya Duerelle LAWSON

4.    Violation

    i.    As detailed in this affidavit, each of the defendants listed above, between on or about January 26, 2023, and continuing to the present, are engaged in an ongoing conspiracy with each other and others known and unknown, to distribute and possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1).

### OVERVIEW OF THE INVESTIGATION INTO THE SARABIA DTO

5.    Since January 2023, the DEA's Sacramento District Office (SDO) has been investigating the Julio SARABIA Drug Trafficking Organization (DTO).  The SARABIA DTO is a drug trafficking enterprise engaged in, among other things, the distribution of large quantities of crystal methamphetamine and other controlled substances, in the area of Sacramento, California and elsewhere.  During this investigation, multiple controlled purchases of crystal methamphetamine and other controlled substances were conducted by confidential sources from multiple co-conspirators within the SARABIA DTO.

6.  Between the period of February 13, 2023 through March 13, 2023, Title III intercepts were authorized on **Target Telephone 1**, used by HUTCHISON.  Between the period of April 19, 2024, through May 19, 2024, Title III intercepts were also authorized on **Target Telephone 2**, used by SARABIA and **Target Telephone 3**, used by HUTCHISON.  During these periods, HUTCHISON and SARABIA spoke explicitly about their drug trafficking activities.

7.  As part of the investigation into the SARABIA DTO, investigators also gathered intelligence and evidence about how the drug trafficking conducted by the SARABIA DTO was inextricably intertwined with relationships among members and associates of the Sacramento-based criminal gang known as My Brother's Keeper.

## BACKGROUND ON THE "MY BROTHER'S KEEPER" CRIMINAL ENTERPRISE

8.  My Brother's Keeper ("MBK") is a criminal enterprise consisting of family members, extended family, and close-knit friends who engage in coordinated criminal activities with one another in the Sacramento area and elsewhere.  Investigators in this case have determined that defendants Julio SARABIA, Michael HUTCHISON, and Jose HERNANDEZ are MBK members and consider Mulan KEOPHIMANH, Johnny TRUONG, Guadalupe CERVANTES, and Tanya Duerelle LAWSON associates who obtain and sell drugs supplied by MBK members, assist MBK members in drug trafficking, and assist MBK members in evading law enforcement detection and protecting against outside threats.

9.  DEA Task Force Andy Cunningham has investigated MBK for a number of years and provided background information detailed here to provide context to the relationships among the drug trafficking conspirators charged in this Criminal Complaint.

10.  According to DEA TFO Cunningham, MBK did not originally begin as a criminal enterprise.  Instead, the group was essentially a collection of family and friends looking out for one another.  At some point, as MBK members grew older, they moved toward large-scale, coordinated drug trafficking that forms the core of MBK member's day-to-day activities and generates income for the group's members and associates.

11.  MBK "members" have their own MBK-related jewelry and clothing, gang signs, and sayings and cliques within the enterprise. Those who claim MBK cannot gain "membership" into the group, like a typical street gang; rather, they are family, extended family, or very close family friends.

12. MBK members have a number of criminal groups that they consider rivals and allies. In particular, MBK consider the Fruitridge Vista Bloods street gang to be an enemy or rival group. This animosity originates from a long-standing feud with a now-deceased Fruitridge Vista Blood street gang member Christopher "Bris" Treadwell. Before his murder by an MBK member in 2020, Treadwell was a rapper with a growing profile in the rap world. MBK members believed that Treadwell had shot at two MBK members on the freeway during a feud. In retaliation, in June 2020, an MBK member ran into Treadwell at a gas station in South Sacramento. After attempting to flee, Treadwell was chased down by the MBK member. The MBK member allegedly shot and killed Treadwell in an execution-style murder. That MBK member is currently facing pending murder charges for the killing.

13. MBK has also formed alliances with criminal street gang members from Varrio Franklin Nortenos, Oak Park Nortenos, and Oak Park Bloods. Over time, some of these alliances have frayed or ceased to exist, but the existence of the alliances is a reflection of the group's coordinated activity to protect its members from being assaulted, shot, or other violent activity.

14. MBK member Michael HUTCHISON formed a particularly close alliance with an Oak Park Blood street gang member named Jerry "Iddy" Crosby. When Crosby was murdered in September 2022 in Sacramento, MBK members paid respect to him and referred to him as their "Splazh." The origin of "Splazh" is allegedly in reference to MBK members shooting rivals and having their rivals blood splash all over the pavement. As depicted in the image below, MBK member John Martinez displays a "Splazh" tattoo on his face (Figure 1) and wears a "Splazh" chain as homage to the slain Crosby (Figure 2).



*Figure 1 – John Martinez displaying "SPLAZH" on side of face. Martinez is SARABIA's half brother.*



*Figure 2 – HUTCHISON is on the right holding an "MBK" pendant and wearing "SPLAZH" pendant – the MBK member on the left side of the photo, John Martinez, also displays a "SPLAZH" pendant.*

15. HUTCHISON is considered one of the most prolific drug dealers in MBK who learned the drug trade from older MBK members, including Julio SARABIA. Evidence in the investigation reveals that Julio SARABIA is the group's primary connection to large-scale methamphetamine suppliers and, within MBK, SARABIA is an influential figure within the gang with significant amount of control over MBK criminal activities. As an example of MBK's interconnected relationships, HUTCHISON's sister is married to co-defendant Jose HERNANDEZ. Thus, the coordinated drug trafficking activity of SARABIA, HUTCHISON, HERNANDEZ detailed below overlaps with familial connections made through marriage and participation in MBK criminal activities.



*Figure 3 – From left to right: MBK members and associates Jose HERNANDEZ, Julio SARABIA, Robert Sarabia, John Martinez, and Michael HUTCHISON*

**MAP OF SARABIA DTO DRUG-RELATED STASH HOUSES**

16. Below is a visual representation of the geographic breadth and multiple drug-related stash houses used and operated by the SARABIA DTO during this investigation.  MBK members and associates make up the portion of the SARABIA DTO targeted by this Criminal Complaint.



## AFFIANT'S BACKGROUND AND EXPERTISE

17. I am a Task Force Officer ("TFO") with the DEA, and have held the assignment since January 2023. I have been sworn as a deputized agent with the DEA and am currently assigned to a DEA Task Force Group. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am also a Peace Officer with the Yuba County Sheriff's Department and have held this position since October of 2014. Prior to my current assignment as a TFO, I was assigned as an Agent with the Yuba-Sutter Narcotic and Gang Enforcement Task Force.

18. The DEA Task Force Group, which is federally funded, is a collaborative group of officers and agents from the DEA and state and local law enforcement agencies including the Yuba County Sheriff's Department, Sacramento Sheriff's Department, Tracy Police Department, California Highway Patrol, Sacramento Police Department, El Dorado County District Attorney's Office, and California Department of Corrections and Rehabilitation. The goal of the DEA Task Force Group is to investigate and disrupt illicit

6

drug trafficking in specified geographical areas by immobilizing the highest levels of targeted violators and trafficking organizations.

19. I have received over 940 hours of law-enforcement training in the Sacramento Police Academy.  Subsequent to my academy training, I received the following POST certified training: Field Training Officer (40 hours), Basic Special Weapons and Tactics (80 hours), California Specialized Training Institute (40 hours), Behavior Analysis Training Institute Interview and Interrogation Techniques (40 hours), CATO Chemical Agent Instructor (40 hours), Robert Presley Institute of Criminal Investigation- Officer-Involved Shooting/Force Investigations (40 hours), Robert Presley Institute of Criminal Investigation- Basic Gang Investigation (40 hours), Sacramento Sheriff's Department- Black Gangs Update (8 hours), Robert Presley Institute of Criminal Investigation- Advanced Gang Investigation (40 hours), Robert Presley Institute of Criminal Investigation- Drug/Narcotics Investigation (80 hours), 55th Annual California Narcotics Officers' Association Conference (23 hours), Behavioral Analysis Training Inc.- Outlaw Motorcycle Gangs (8 hours), State of California Department of Justice- Electronic Wiretap Surveillance (8 hours), California Narcotics Officers' Association- Inside a Mexican Drug Cartel (8 hours), NES Inc.- Basic Clandestine Laboratory Safety (32 hours), 57th Annual California Narcotics Officers' Association Conference (23 hours), Los Angeles HIDTA Basic and Intermediate Undercover Techniques and Survival (36 hours),  National California Gang Investigators Association Conference (24 hours), Drug Enforcement Administration Task Force Officer School (40 hours), and International Narcotics Interdiction Association Conference (28 hours).

20. Through my training, experience, and interaction with other experienced Special Agents, Task Force Agents, and other drug investigators, I have become familiar with the methods employed by drug traffickers to smuggle, safeguard, store, transport, and distribute drugs, to collect and conceal drug related proceeds, and to communicate with other participants to accomplish such objectives.  These methods include the use of telephones, pre-paid or debit calling cards, public telephones, wireless communications technology such as paging devices and cellular telephones, counter-surveillance, elaborately planned smuggling schemes tied to legitimate businesses, and use of codes in communications in an attempt to avoid detection by law enforcement.  Based on my training and experience, I also know that violators of the controlled substances laws often purchase telephones or subscribe to telephone service using false names and/or other individuals' names to avoid detection by law enforcement.

21. In addition to my personal knowledge, this affidavit is based on (1) information I obtained from related investigations; (2) conversations with other law enforcement officers including oral and written investigative and laboratory reports that I received

directly or indirectly from other law enforcement officials; (3) review and analysis of information received from various sources, including evidence provided pursuant to subpoenas and search warrants, such as GPS tracking data; (4) physical surveillance conducted by law enforcement officials reported to me either directly or indirectly; (5) a review of public records, telephone toll records, and subscriber information; (6) information provided from confidential sources of information, cooperating defendants, and other sources of information working with law enforcement agencies; (7) a review of driver's license and automobile registration records; (8) records from various law enforcement databases, including but not limited to the National Law Enforcement Telecommunications System ("NLETS") and the National Crime Information Center ("NCIC"); (9) my training and experience as a DEA TFO and/or; (10) the training and experience of other law enforcement officials with whom I consulted during this investigation and the preparation of this Affidavit.

22. This Affidavit is also based upon Title III intercepts of telephone number 916-896-8190 (**Target Telephone 1** or **TT#1**) and 530-575-2921 (**Target Telephone 3** or **TT#3**), both used by Michael HUTCHISON and 279-386-8415 (**Target Telephone 2** or **TT#2**), used by Julio SARABIA.  Pursuant to those intercepts, I have reviewed transcripts and audio recordings of intercepted telephone calls from **TT#1, TT#2, and TT#3**.

23. Because this affidavit is submitted for the limited purpose of supporting the requested Criminal Complaint, I have not included the details of every aspect of the investigation.  I have set forth only the facts necessary to establish probable cause to charge the defendants listed in this affidavit.  I have not intentionally omitted information that the Court would need to assess probable cause for the arrest of the defendants.

## STATEMENT OF PROBABLE CAUSE

### January 26, 2023 – CS-1 conducts initial meeting with HUTCHISON to discuss future drug deals

24. On January 26, 2023, a DEA Confidential Source ("CS-1"), placed multiple recorded phone calls to HUTCHISON at telephone number (530) 315-4282 ("Prior Telephone #1") and arranged to meet with HUTCHISON in a Carl's Jr parking lot, located at 3776 Northgate Boulevard in Sacramento, for the purpose of discussing future drug deals.  Agents observed CS-1 enter the phone number and place the calls.  Agents subsequently monitored each of the calls between CS-1 and HUTCHISON to verify the content of the conversations.

25. CS-1 is currently working with law enforcement for monetary compensation. CS-1 has criminal history that includes multiple convictions, including felony convictions for burglary, vehicle theft, and receipt of stolen property and a conviction for dissuading a witness by threat or force. In this investigation, whenever possible, agents attempted to corroborate information provided by CS-1 through the monitoring or recording of his/her conversations with target subjects, conducting surveillance to verify who was involved in the drug deals, obtaining pen registers and ping warrants to determine who the targets were talking to, and, ultimately, receiving court approval to conduct Title III interceptions to hear what the conspirators were saying to one another in conversations that were unguarded and did not involve CS-1. Through these techniques, agents gathered extensive corroborating evidence of information provided by CS-1 in this investigation. Based on these efforts, I am not aware of CS-1 providing false or misleading information during this investigation. For these reasons, I believe CS-1 to be reliable in this case.

26. At approximately 2:35 p.m. on January 26, 2023, CS-1 arrived at the Carl's Jr parking lot at 3776 Northgate Boulevard to discuss future drug deals with HUTCHISON. Agents monitored CS-1 through an audio recording device on his/her person during the meeting, and a recording of the in-person meeting between CS-1 and HUTCHISON was obtained. At approximately 2:45 p.m., agents observed a grey Audi sedan, bearing California license plate 8VDR014,[1] enter the Carl's Jr parking lot and park next to CS-1's vehicle. Agents observed HUTCHISON exit the Audi sedan through the right front passenger door and enter CS-1's vehicle. A short time later, agents observed HUTCHISON exit CS-1's vehicle, return to the Audi sedan, and depart the Carl's Jr parking lot.

27. After the meeting, CS-1 told agents that CS-1 and HUTCHISON had a general discussion during which HUTCHISON indicated that he would sell CS-1 methamphetamine for $1,100 per pound and heroin for $600 per ounce. CS-1 also inquired about blue fentanyl-laced pills made to look like "M-30" Oxycodone tablets. HUTCHISON told CS-1 that he does not sell "M-30" tablets, but represented that he could acquire them and quoted CS-1 $1,300 for a "boat" ("boat" is slang for 1,000-pill quantities tablets labeled with the "M-30" stamp and laced with fentanyl). HUTCHISON further stated that he would lower the prices on the methamphetamine, heroin, and "M-30" tablets if CS-1 were to purchase a bigger amounts.

---

[1]      The DMV registration information for the Audi sedan, bearing California license plate 8VDR014, is listed in the name of Carlos Sanchez Jr, 8105 Haystack Drive, Sacramento, CA. As detailed in this affidavit, Carlos Sanchez assisted in the SARABIA DTO's ongoing drug trafficking activities during an April 12, 2023 drug deal detailed below.

28. Agents subsequently reviewed the audio recording of the meeting and confirmed the basics of the CS-1's descriptions of the meeting and interaction with HUTCHISON.  It should be noted that the actual language used in the conversation between CS-1 and HUTCHISON is summarized here and explained in a way that clarifies the language they used in speaking to one another.  The summary and later summaries below are based upon agents' understanding of the language and terms used by CS-1 and others in the recorded conversations and, at times, what CS-1 understood the conversation to mean as he/her understood it.

**February 3, 2023 – CS-1 purchased approximately 1,000 fentanyl-laced pills made to look like "M-30" Oxycodone tablets and approximately one pound of crystal methamphetamine from HUTCHISON**

29. On February 3, 2023, DEA conducted a controlled purchase[2] of approximately 1,000 fentanyl-laced pills made to look like "M-30" Oxycodone tablets and one pound of crystal methamphetamine from HUTCHISON using CS-1.  At the direction of agents, CS-1 placed multiple recorded telephone calls to HUTCHISON on Prior Telephone #1.  Agents observed CS-1 enter the phone number and place the calls; agents subsequently monitored each of the calls.

30. During those calls, CS-1 negotiated to purchase approximately 1,000 fentanyl-laced pills made to look like "M-30" Oxycodone tablets and one pound of crystal methamphetamine for $2,600.  CS-1 and HUTCHISON agreed to conduct the drug deal in a Walmart Supercenter parking lot located at 6051 Florin Road in Sacramento.

31. At approximately 2:00 p.m. on February 3, agents observed a black Cadillac CTS bearing California license plate 9ACJ360[3] enter the parking lot.  At approximately 2:04 p.m., agents observed CS-1 arrive in the Walmart Supercenter parking lot.  CS-1 entered the Cadillac CTS through the right front passenger door.  At approximately 2:10 p.m., agents

---

[2]      Except as otherwise noted, a "controlled purchase" is a drug deal conducted by a CS under the direction of law enforcement for the purpose of acquiring evidence of drug trafficking against the Target Subject(s).  During each controlled purchase operation detailed in this affidavit, the CS was provided with officially advanced government funds to purchase drugs, the CS and CS's vehicle were searched before and after the operation for weapons and contraband, the CS was equipped with concealed audio/video recorder(s) and a transmitter, surveillance was conducted on the CS/CS's vehicle prior to, during, and following the operation, and post-operation statements were taken from the CS.

[3]      The DMV registration information for the black Cadillac CTS, bearing California license plate 9ACJ360, lists the owner as Esperanza Velazquez, 613 Maple St. #3, Sacramento, CA.

observed CS-1 exit the Cadillac CTS and return to CS-1's vehicle. After the controlled purchase, CS-1 told agents that HUTCHISON grabbed a white shopping bag from beneath the driver's seat and handed it to CS-1. CS-1 observed that the white shopping bag held a plastic bag containing crystal methamphetamine and another plastic bag containing the fentanyl-laced pills made to look like "M-30" Oxycodone tablets. CS-1 stated that CS-1 handed $2,600 to HUTCHISON in exchange for the crystal methamphetamine and fentanyl-laced pills made to look like "M-30" Oxycodone tablets.

32. Agents followed the Cadillac CTS and observed it drive into the Greenback Lane Apartments, located at 6320 Greenback Lane, Citrus Heights, California, before HUTCHISON entered an apartment located in the southwest structure on the second floor.

33. After the drug deal, agents submitted the crystal methamphetamine and tablets purchased from HUTCHISON on February 3, 2023, to a DEA laboratory for analysis. The DEA lab confirmed the crystal methamphetamine contained a net of 447.4 grams of methamphetamine. The DEA lab further confirmed that the fentanyl-laced pills made to look like "M-30" Oxycodone tablets contained fentanyl and acetaminophen with a net weight of 104.9 grams.

**March 9, 2023 – CS-1 purchased approximately two pounds of crystal methamphetamine from HUTCHISON**

34. On March 9, 2023, DEA conducted a controlled purchase of crystal methamphetamine from HUTCHISON using CS-1. At the direction of agents, CS-1 placed multiple recorded phone calls to HUTCHISON at telephone (530) 638-1008 ("Prior Telephone #2"). Agents observed CS-1 enter the phone number and place the calls; agents subsequently monitored each of the calls.

35. During those calls, CS-1 negotiated to purchase two pounds of crystal methamphetamine from HUTCHISON later that day for $2,400. CS-1 and HUTCHISON agreed to conduct the drug deal in the Carl's Jr parking lot, located at 3776 Northgate Boulevard in Sacramento (the same location as the initial drug-related meeting on January 26).

36. At approximately 12:49 p.m., CS-1 arrived in the Carl's Jr parking lot. At approximately 1:25 p.m., agents observed a black Kia SUV bearing California license plate 8XAF443[4]

---

[4] The registration information on the black Kia SUV, bearing California license plate 8XAF433, is P V Holding Corp., 5721 W. 96th Street, Los Angeles, CA. From my training and experience, I know that this vehicle is an Avis/Budget/Payless/Zipcar rental car. An open

arrive in the Carl's Jr parking lot and park directly to CS-1's vehicle.  Agents then observed HUTCHISON exit the Kia SUV and enter CS-1's vehicle through the right front passenger door.  Following the controlled purchase, CS-1 told agents that HUTCHISON entered CS-1's vehicle while carrying a plastic shopping bag.  CS-1 stated that CS-1 handed the $2,400 to HUTCHISON in exchange for the plastic shopping bag which contained the two pounds of crystal methamphetamine.

37. At approximately 1:28 p.m., agents observed HUTCHISON exit CS-1's vehicle and return to the KIA SUV.  Agents followed the Kia SUV and observed it drive into a gated community located at 6503 Brando Loop, Fair Oaks, California.

38. Agents submitted the crystal methamphetamine purchased from HUTCHISON on March 9 to a DEA laboratory for analysis.  The DEA lab confirmed the substance contained a net weight of 902.5 grams of methamphetamine.

## April 12, 2023 – CS-1 purchased approximately three pounds of crystal methamphetamine from HUTCHISON

39. On April 5, 2023, the Honorable Kendall J. Newman authorized activation of GPS "ping" intercepts on Prior Telephone #2 used by HUTCHISON, for a period of 30 days.

40. On April 12, 2023, the DEA conducted a controlled purchase of crystal methamphetamine from HUTCHISON using CS-1.  At the direction of agents, CS-1 placed multiple recorded phone calls to HUTCHISON on Prior Telephone #2.  Agents observed CS-1 enter the phone number and place the calls; agents subsequently monitored each of the calls.

41. During those calls, CS-1 negotiated to purchase three pounds of crystal methamphetamine for $3,300 ($1,100 per pound) from HUTCHISON.  CS-1 and HUTCHISON agreed to conduct the aforementioned drug deal in the Carl's Jr parking lot located 3776 Northgate Boulevard, in Sacramento (the same location that was familiar to agents from the January 26 meeting and the March 9 drug deal).

42. At approximately 11:00 a.m., and using GPS ping data for Prior Telephone #2, agents observed HUTCHISON drive his Cadillac CTS into the garage of 6503 Brando Loop, Fair Oaks, California.  At approximately 5:17 p.m., agents observed HUTCHISON, Carlos SANCHEZ, and two other unidentified individuals enter the Cadillac CTS and depart 6503 Brando Loop.  Agents followed the Cadillac CTS and observed the Cadillac

---

source search of this address reveals that it corresponds with an address for Avis Budget Car Rental LLC.

CTS arrive at the Terracina Gold Apartments, located at 4451 Gateway Park Boulevard[5] ("Target Location 2"), Sacramento, California, and park in a parking stall.

43. At approximately 6:00 p.m., agents observed CS-1 arrive at the Carl's Jr parking lot. At approximately 6:03 p.m., agents observed Julio SARABIA exit an apartment building and contact HUTCHISON in the Cadillac CTS. Agents then observed SARABIA enter the driver's seat of a white Buick SUV bearing California license plate 8YUZ121.[6] HUTCHISON, SANCHEZ, and the two other individuals exited the Cadillac CTS and then entered the Buick SUV with SARABIA in the driver's seat. Agents then observed the Buick SUV depart the apartment complex and arrive in the Carl's Jr parking lot. Agents observed it park directly next to CS-1's vehicle. Agents observed HUTCHISON exit the Buick SUV and enter CS-1's vehicle through the right front passenger door. A short time later, agents observed HUTCHISON exit CS-1's vehicle and return to the Buick SUV. The Buick SUV then departed the Carl's Jr parking lot. This coordinated cooperation to assist one another with the drug deal demonstrates the interconnected nature of the SARABIA DTO and MBK members and associates acting in concert to distribute drugs.

44. After the controlled purchase, CS-1 told agents that HUTCHISON entered CS-1's vehicle while carrying a small black backpack. CS-1 stated that CS-1 counted the $3,300 and handed it HUTCHISON. HUTCHISON then removed two large plastic bags containing the three pounds of crystal methamphetamine from inside the backpack and handed it to CS-1.

45. Agents submitted the substance purchased from HUTCHISON on April 12 to a DEA laboratory for analysis. The DEA lab confirmed that the substance contained a net weight of 1,344 grams of methamphetamine.

46. In May and June 2023, the investigation identified two travel patterns of SARABIA DTO members that were consistent with the pickup and transportation of large

---

[5]    DEA TFO Andy Cunningham was familiar with Julio SARABIA from previous law enforcement contacts and had prior intelligence that SARABIA resided at 4451 Gateway Park Boulevard. The events of April 12 partially corroborated this intelligence because agents saw HUTCHINSON and SANCHEZ arriving at this address in advance of a drug deal, consistent with HUTCHINSON and SANCHEZ picking up SARABIA and the drugs before heading to the drug deal with CS-1.

[6]    The registration information on the white Buick SUV, bearing California license plate 8YUZ121, is P V Holding Corp 5721 W, 96th Street, Los Angeles, 90045. From my training and experience, I know that this vehicle is an Avis/Budget/Payless/Zipcar rental car. As mentioned above, this address corresponds with an address for Avis Budget Car Rental LLC.

methamphetamine loads. Based on the investigative steps detailed below, agents recovered two massive seizures of methamphetamine close in time to one another – one on May 19, 2023, and the other on June 6, 2023. Both seizures occurred during and in furtherance of the overall drug trafficking conspiracy headed by SARABIA and HUTCHISON. The map below provides a visual representation of the locations where two different SARABIA DTO couriers were arrested with the organization's drugs.



**<u>May 19, 2023 – Arrest of Co-Conspirator 1, a drug courier for the SARABIA DTO, and seizure of approximately 200 pounds of crystal methamphetamine</u>**

47. On May 4, 2023, the Honorable Jeremy D. Peterson authorized the installation and activation of a tracking device on HUTCHISON's black Cadillac CTS.

48. On May 19, 2023, at approximately 6:31 p.m., law enforcement conducted a surveillance operation of Co-Conspirator 1, a suspected drug courier for the SARABIA DTO. While agents followed Co-Conspirator 1, GPS vehicle tracker data of the Cadillac CTS revealed that the Cadillac CTS departed 6503 Brando Loop and was travelling southbound on State Route 99 toward Elk Grove.

49. At approximately 6:41 p.m., agents observed Co-Conspirator 1 arrive in the Starbucks parking lot in Elk Grove, and park in a parking stall.  Agents then observed the Cadillac CTS also arrive at the Starbucks and park next to Co-Conspirator 1.  Agents observed HUTCHISON exit the Cadillac CTS and enter Co-Conspirator 1's vehicle through the right front passenger door.  Agents observed HUTCHISON exit Co-Conspirator 1's vehicle a few minutes later and return to Cadillac CTS.  Agents then observed Co-Conspirator 1 and the Cadillac CTS depart the Starbucks parking lot.

50. Agents observed Co-Conspirator 1 merge onto California State Route 99 and head south. Agents maintained physical surveillance of Co-Conspirator 1's vehicle as it entered Riverbank, California (located in Stanislaus County).

51. Agents then observed Co-Conspirator 1's vehicle stop at a residence.  Due to visual constraints, agents were unable to view activity in and around the vehicle.  Agents next observed Co-Conspirator 1's vehicle depart from the residence in Riverbank and head north on State Route 99.

52. With the assistance of California Highway Patrol, CHP conducted a traffic stop on Co-Conspirator 1's vehicle in Stockton based upon an observed California Vehicle Code violation.  A CHP officer deployed his controlled substance detection canine to perform a cursory search of the vehicle.  The canine unit alerted to the presence of drugs in the vehicle.  A subsequent search of the vehicle yielded eight large black trash bags, each containing a substantial amount of plastic Ziploc bags which contained crystal methamphetamine (approximately 217 pounds total).  Officers also located two cell phones.

53. Agents submitted the methamphetamine seized from Co-Conspirator 1 on May 19 to a DEA laboratory for analysis.  The DEA lab later confirmed the substances seized from Co-Conspirator 1's vehicle on May 19 contained a total net weight of 89,000 grams of methamphetamine.

54. A subsequent proffer interview with Co-Conspirator 1 confirmed the interconnected relationships within the SARABIA DTO and its significant scope and scale as a substantial drug trafficking organization.

## **Proffer interview with Co-Conspirator 1**

55. A short time after the arrest of Co-Conspirator 1, agents interviewed him/her.  According to Co-Conspirator 1, SARABIA asked him/her on the day of the seizure (May 19, 2023)

if Co-Conspirator 1 could pick up drugs in Riverbank. Co-Conspirator 1 agreed to this proposal. Before driving to Riverbank, Co-Conspirator 1 said he/she met with SARABIA and HUTCHISON in a Starbucks parking lot located in Elk Grove. According to Co-Conspirator 1, HUTCHISON got into Co-Conspirator 1's vehicle and provided Co-Conspirator 1 with a bag full of money to give to the "Mexican" who Co-Conspirator 1 would be meeting with in Riverbank. Co-Conspirator 1 explained that he/she did not know how much money was in the bag nor did Co-Conspirator 1 know what kind of drugs he/she was picking up. According to Co-Conspirator 1, SARABIA communicated with him/her over a pre-paid phone that SARABIA had given Co-Conspirator 1. Co-Conspirator 1 told agents that the address where he/she picked up the drugs from was in a text message sent by SARABIA to him/her on the pre-paid cell phone. Co-Conspirator 1 further told agents that he/she was supposed to pick up another load of drugs in Los Angeles for SARABIA on May 20, 2023 (the day after the seizure).

56. Co-Conspirator 1 told agents that he/she has known SARABIA for approximately two years. Co-Conspirator 1 said that SARABIA was in a dating relationship with Selena Torres. Co-Conspirator 1 told agents that he/she was approached by SARABIA and Torres sometime in January 2023 about transporting loads of drugs for SARABIA and Co-Conspirator 1 agreed. Agents asked Co-Conspirator 1 if Torres was also involved in the distribution of drugs. According to Co-Conspirator 1, he/she believed Torres was involved. Co-Conspirator 1 stated that SARABIA has a "direct line" (meaning direct communication) to drug sources.

57. Co-Conspirator 1 could not recall the number of times he/she had transported drugs at the direction of SARABIA but estimated it to be anywhere from five to ten times since January 2023. Co-Conspirator 1 told agents that SARABIA had given him/her a pre-paid phone in January 2023. Co-Conspirator 1 told agents that he/she used the pre-paid phone to communicate with SARABIA whenever he/she picked up loads of drugs for SARABIA. Agents asked Co-Conspirator 1 about the first few times he/she picked up loads of drugs for SARABIA. Co-Conspirator 1 said that during those early drug trips, SARABIA followed him/her in a separate vehicle and the two met with an unidentified Hispanic adult in a parking lot in Riverbank. Co-Conspirator 1 stated that the unidentified Hispanic adult loaded black trash bags full of drugs in the trunk of Co-Conspirator 1's vehicle. Co-Conspirator 1 told agents that he/she never looked in the black trash bags to see what kind of drugs it contained nor did SARABIA ever tell Co-Conspirator 1. Co-Conspirator 1 stated that SARABIA stopped following him/her after the first few drug runs because Co-Conspirator 1 believed that he/she had earned SARABIA's trust. Co-Conspirator 1 further stated that he/she has picked up and transported loads of drugs for SARABIA from Riverbank, Fresno, and Bakersfield.

58. TFO Aaron Kacalek showed Co-Conspirator 1 photographs of the following individuals for identification purposes; the photos did not list any identifying information:

    a)      Julio SARABIA:  Co-Conspirator 1 positively identified SARABIA as the person who enlisted him/her to transport large loads of drugs on multiple occasions since January 2023; and

    b)      Michael HUTCHISON III: Co-Conspirator 1 positively identified HUTCHISON as SARABIA's "right hand man" in the drug business.

59. Co-Conspirator 1 described SARABIA as at the "top" (leader) of the drug trafficking organization, with HUTCHISON as SARABIA's "right hand man."  Co-Conspirator 1 described HUTCHISON as also holding a leadership role within the drug trafficking organization.

60. Agents asked Co-Conspirator 1 about the last time he/she transported drugs prior to his/her arrest on May 19.  Co-Conspirator 1 said he/she picked up a load of drugs from the same residence in Riverbank not that long before the May 19 drug seizure.  After picking up the load of drugs in Riverbank, Co-Conspirator 1 said he/she was directed by HUTCHISON to meet him at the Carl's Jr located at 5201 Elkhorn Blvd in Sacramento. When Co-Conspirator 1 arrived at the Carl's Jr parking lot, HUTCHISON guided him/her via telephone to a residence near the Carl's Jr.  Once at the residence, Co-Conspirator 1 stated that he/she met with SARABIA and HUTCHISON, who then proceeded to unload the black trash bags from Co-Conspirator 1's vehicle and into the residence.

61. At the time of the proffer, Co-Conspirator 1 was represented by counsel and agreed to provide information in the hope of not being prosecuted in federal court given the higher penalties for such drug crimes.  After receiving Co-Conspirator 1's proffer and verifying material aspects of his/her information, Co-Conspirator 1 entered a guilty plea in a state jurisdiction.

**June 6, 2023 – Arrest of Tanya LAWSON, a second drug courier for the SARABIA DTO, and seizure of approximately 200 pounds of methamphetamine**

62. After the May 19 seizure and arrest of Co-Conspirator 1 with methamphetamine from the SARABIA DTO, agents conducted a second operation a few weeks later which resulted in a second large seizure and arrest of a second courier operating for the SARABIA DTO.

63. On June 6, 2023, at approximately 3:50 a.m., GPS vehicle tracker data showed the Cadillac CTS used by HUTCHISON and SARABIA throughout this investigation departing Sacramento and travelling south. At approximately 10:00 a.m., GPS vehicle tracker data showed the Cadillac CTS in Lancaster, California (located in northern Los Angeles County). Agents observed GPS ping data for Prior Telephone #2 show that Prior Telephone #2 was travelling with the Cadillac CTS in Lancaster.

64. At approximately 10:09 a.m., GPS vehicle tracker data indicated that the Cadillac CTS stopped in a Dollar General parking lot in Sun Village, California (south of Lancaster but also located in Los Angeles County). At approximately 10:22 a.m., GPS vehicle tracker data revealed that the Cadillac CTS departed the Dollar General parking lot and drove to the rural area of 110th Street R and E Avenue K8 in Sun Village. Per GPS vehicle tracker data, the Cadillac CTS stopped briefly. This location is very remote with no buildings or structures for miles and little to no vehicle traffic. The Cadillac CTS then departed the area of 110th Street E and E Avenue K8 and headed north on Interstate 5.

65. Based on my training and experience, this observed pattern of travel on June 6 was consistent with a drug trafficker travelling out of town to pick up their drugs with an immediate turnaround to avoid detection by law enforcement and minimize the risk of being stopped with the drugs in his/her possession. In assessing the travel pattern of the observed GPS vehicle tracker data for the Cadillac CTS, I formed the opinion that the Cadillac CTS was travelling in a manner consistent with the pickup of a drug load because it travelled a great distance at odd hours (starting at 3:50 a.m.), had a short stay in the ultimate destination (a remote residence) and then returned in a direction consistent with where the courier's travel had initially begun early that morning.

66. At approximately 1:28 p.m., GPS vehicle tracker data revealed that the Cadillac CTS stopped at the Food Mart gas station parking lot in Bakersfield (north of Sun Village and Lancaster and located in Kern County). TFO Aaron Kacalek noted the Food Mart was located directly next to the Buttonwillow CHP office. TFO Kacalek contacted CHP Sergeant Basil Zuniga and requested that he drive through the Food Mart parking lot to verify that the Cadillac CTS was at that location and whether there were any other vehicles travelling in tandem with the Cadillac CTS.

67. At approximately 1:35 p.m., Sergeant Zuniga drove through the Food Mart gas station parking lot. Sergeant Zuniga confirmed through observation that the Cadillac CTS parked at the gas pumps and a 2012 black Hyundai Azera, bearing California license plate 9FUR846, parked directly in front of the Cadillac CTS. Per GPS vehicle tracker data, the Cadillac CTS departed the parking lot a short time later and again headed north on Interstate 5.

68. At approximately 5:04 p.m., agents observed the Cadillac CTS following the Hyundai Azera northbound on Interstate 5 south of the 580 interchange. Agents were able to confirm the driver of the Cadillac CTS was HUTCHISON and the front passenger was SARABIA. Agents maintained physical surveillance of the Cadillac CTS and Hyundai Azera as they continued north on Interstate 5 towards Sacramento.

69. The observed pattern of behavior with HUTCHISON and SARABIA driving in tandem with the suspected drug load car (the Hyundai Azera) was consistent with drug traffickers who will often use an escort vehicle to maintain visual observation of their drugs and provide additional security if needed or a distraction if law enforcement seeks to stop the drug load vehicle.

70. In this case, the observed behavior of HUTCHISON and SARABIA of driving in tandem with the suspected load vehicle was consistent with the two conspirators driving in the Cadillac in order to track the movements of a valuable drug load being carried in the Hyundai. Moreover, the observed behavior of HUTCHISON and SARABIA travelling in tandem with a load car was consistent with what Co-Conspirator 1 described as the *modus operandi* for the SARABIA DTO.

71. Law enforcement conducted a traffic stop of the Hyundai Azera based upon an observed California Vehicle Code violation. The officer identified the driver and sole occupant of the Hyundai Azera as Tanya LAWSON. Another officer deployed his controlled substance detection canine to perform a cursory search of the vehicle. The canine unit alerted to the presence of drugs in the vehicle.

72. A subsequent search of the vehicle yielded seven large black trash bags and one grocery bag, each containing a substantial amount of plastic Ziploc bags further containing crystal methamphetamine (approximately 216 pounds total). The packaging of the drugs in trash bags and location in the trunk of the vehicle was consistent with Co-Conspirator 1's description of how the drugs were loaded into his/her car when transporting loads for the SARABIA DTO (and the packaging seized by law enforcement from Co-Conspirator on May 19).

73. After the traffic stop of the Hyundai Azera, the Cadillac CTS containing HUTCHISON and SARABIA accelerated at a high rate of speed on Interstate 5 and headed towards Elk Grove. Agents observed HUTCHISON abandon the Cadillac CTS in the back of a shopping center in Elk Grove. Agents observed HUTCHISON and SARABIA exit the Cadillac CTS and walk away from the vehicle towards an unknown location.

19

74. Agents submitted the substance seized from LAWSON and the SARABIA DTO on June 6 to a DEA laboratory for analysis. The DEA lab later confirmed the drugs in the car consisted of a net weight of 88,874 grams of methamphetamine.

### July 31, 2023 – CS-1 purchased approximately two pounds of methamphetamine and two ounces of heroin from HUTCHISON – identification of SARABIA DTO member Johnny TRUONG

75.    On July 31, 2023, DEA conducted a controlled purchase of crystal methamphetamine from HUTCHISON using CS-1. At the direction of agents, CS-1 placed multiple recorded phone calls to HUTCHISON at telephone number (916) 293-6113 ("Prior Telephone #3").

76. During those calls, CS-1 negotiated to purchase two pounds of crystal methamphetamine for $2,200 ($1,100 per pound) from HUTCHISON. CS-1 and HUTCHISON agreed to conduct the drug deal in a Carl's Jr parking lot located at 5201 Elkhorn Boulevard in Sacramento.

77. Before the drug deal, the Honorable Allison Claire authorized activation of GPS "ping" intercepts on Prior Telephone #3, used by HUTCHISON, for a period of 30 days.

78. Agents observed GPS ping data for Prior Telephone #3 indicate that Prior Telephone #3 was located at 6503 Brando Loop, in Fair Oaks. Based on this information, agents established surveillance in the vicinity of 6503 Brando Loop.

79. At approximately 3:26 p.m. on July 31, agents observed HUTCHISON and a Hispanic female adult, later identified as Marcelina Martinez, exit 6503 Brando Loop and enter a 2022 white Toyota Camry, bearing California license plate 9FUA744.[7] Agents observed HUTCHISON enter the driver seat and Martinez enter the right front passenger seat of the Toyota Camry. Agents then followed the Toyota Camry.

80. At approximately 3:40 p.m., CS-1 arrived in the Carl's Jr parking lot. At approximately 4:23 p.m., agents observed HUTCHISON arrive to the Carl's Jr parking lot in the Toyota Camry and park directly next to CS-1's vehicle. Agents observed HUTCHISON exit the Toyota Camry and enter CS-1's vehicle through the right front passenger door. A short time later, agents observed HUTCHISON exit CS-1's vehicle, return to the Toyota Camry, and leave the Carl's Jr parking lot. Agents observed that GPS ping data for Prior

---

[7]    The registration information on the white Toyota Camry, bearing California license plate 9FUA744, is Marcelina Alaura Martinez, 8145 Wyndwillow Way, Elk Grove, CA.

Telephone #3 was consistent with the observed geographical location where agents saw HUTCHISON during surveillance. In other words, the observed movements of HUTCHISON matched the ping data for HUTCHISON's Prior Telephone #3. This observed connection was consistent with HUTCHISON being in possession of Prior Telephone #3 during the drug deal.

81. After the controlled purchase, CS-1 told agents that HUTCHISON was unable to get the two pounds of crystal methamphetamine from his stash house because the individual who resides at the stash house was not home. HUTCHISON told CS-1 that he went elsewhere to try to acquire the two pounds of crystal methamphetamine and that he was only able to acquire a half pound of crystal methamphetamine. HUTCHISON handed CS-1 a plastic Ziploc bag containing the drugs and told CS-1 that he would charge $600 for the half pound of crystal methamphetamine. CS-1 stated that CS-1 counted out $600 in front of HUTCHISON and then handed the cash to HUTCHISON in exchange for the crystal methamphetamine. CS-1 stated that HUTCHISON told CS-1 that the individual who resides at the stash house would be home in the evening, and that HUTCHISON would be able to supply CS-1 with any additional crystal methamphetamine and/or heroin after 5:00 p.m. Agents subsequently reviewed the audio recording of the buy and confirmed that CS-1's descriptions of his/her conversation with HUTCHISON were consistent with the recorded conversations.

82. At approximately 4:53 p.m. on July 31, at the direction of agents, CS-1 negotiated to purchase one and a half pounds of crystal methamphetamine and two ounces of heroin for $2,700 with HUTCHISON over Prior Telephone #3. Agents observed CS-1 enter the phone number and place the calls; agents subsequently monitored each of the calls. During those calls, HUTCHISON agreed to conduct the drug deal at the same Carl's Jr parking lot. At approximately 5:09 p.m., agents observed HUTCHISON depart the 6503 Brando Loop residence in the Toyota Camry. Agents followed the Toyota Camry and observed it arrive and park in front of 6671 Hillsdale Boulevard in Sacramento.

83. At approximately 5:32 p.m., CS-1 arrived in the Carl's Jr parking lot. At approximately 5:40 p.m., agents observed a blue sedan pull into the driveway of the 6671 Hillsdale Boulevard residence. Agents observed HUTCHISON exit the Toyota Camry and meet with an individual who exited the blue sedan. The individual was later identified by TFO Kacalek as Johnny TRUONG. Agents observed HUTCHISON and TRUONG walk into the 6671 Hillsdale Boulevard residence through the front door. Agents then observed HUTCHISON exit the residence and move towards the driveway of the residence. Agents then observed TRUONG exit the residence and hand something to HUTCHISON. Agents watched HUTCHISON walk directly back to the Toyota Camry and then depart from the 6671 Hillsdale Boulevard residence. These observations are consistent with

21

TRUONG providing the drugs to HUTCHISON shortly before HUTCHISON goes to meet with CS-1 to buy the drugs.

84. Consistent with this thesis, at approximately 5:52 p.m. on July 31, agents observed HUTCHISON arrive in the Carl's Jr parking lot and park directly next to CS-1's vehicle before exiting the Toyota Camry and entering CS-1's vehicle through the right front passenger door.  Agents then observed HUTCHISON exit CS-1's vehicle and return to the Toyota Camry which then departed the Carl's Jr parking lot.

85. After the controlled purchase, CS-1 told agents that HUTCHISON handed CS-1 a plastic Ziploc bag containing one and a half pounds of crystal methamphetamine and a plastic sandwich bag containing two ounces of heroin.  CS-1 stated that he/she then handed the $2,700 to HUTCHISON in exchange for the crystal methamphetamine and heroin.

86. Agents sent the crystal methamphetamine and heroin to a DEA laboratory for analysis. The DEA lab confirmed the substances sold by HUTCHINSON on July 31.  The DEA lab confirmed that the methamphetamine seized from the first drug buy on July 31, contained a net weight of 223.2 grams of methamphetamine.  The DEA lab confirmed that the heroin sold by HUTCHISON on July 31 contained a net weight of 50.9 grams of heroin.

87. The final weight for the second purchase of crystal methamphetamine is still pending. However, based on my training and experience, I believe the substance was crystal methamphetamine based upon the course of dealings with HUTCHISON, including the confirmed methamphetamine in the previous drug deals.

**September 16, 2023 – Law enforcement arrest Johnny TRUONG based upon a search warrant at the 6671 Hillsdale Boulevard stash house – they seize a large amount of drugs and one firearm**

88. On September 16, 2023, at approximately 6:30 a.m., GPS ping data for Prior Telephone #3 indicated that HUTCHISON was travelling south on Interstate 5. At approximately 7:30 a.m., TFO Kacalek reviewed the GPS data and observed that HUTCHISON's telephone was located at the Black Bear Diner in Buena Park, California (located in northern Orange County, California). A short time later, GPS data indicated that HUTCHISON's telephone was travelling back northbound in a path of travel consistent with going to Sacramento.

89. At approximately 5:47 p.m., GPS data indicated that HUTCHISON's telephone was located at the 6671 Hillsdale Boulevard stash house in Sacramento. Around the same time, I observed a black Honda Accord, bearing California license plate 8LBR382,[8] backed into the driveway of the 6671 Hillsdale Boulevard residence via a pole camera.

90. TFO Kacalek drove by the 6671 Hillsdale Boulevard stash house and saw HUTCHISON sitting in the right front passenger seat and an unidentified female sitting in the driver seat of the Honda Accord. TFO Kacalek ran a search of the Honda Accord's license plate number through a License Plate Reader (LPR) database system to see where that vehicle had been earlier that day. The LPR database reported data showing that the Honda Accord license plate scanned in Huntington Beach, California, at 7:11 a.m. that same morning. This information was consistent with the Honda Accord being driven to Sacramento from Southern California area that same day.

91. Based on my training, experience, knowledge of this investigation, and the inference drawn from the data provided from the LPR and the observations of surveillance agents, I suspected that HUTCHISON drove to Southern California in order to pick up a load of drugs and had the unidentified female in the black Honda Accord drive the load of drugs back to the 6671 Hillsdale Boulevard stash house. Later that day, a Sacramento Superior Court Judge authorized a search warrant for the 6671 Hillsdale residence.

92. At approximately 10:55 p.m., members of the Sacramento County Sheriff's Department executed the search warrant at the 6671 Hillsdale residence. Law enforcement located Johnny TRUONG, Amanda Bartels, and Kailani Bautista inside the residence.

---

[8]     The registration information on the black Honda Accord, bearing California license plate 8CPV723, is Camron Lee, 3325 May Street, Sacramento, CA.

93. A subsequent search of the residence yielded approximately 34 pounds of suspected crystal methamphetamine, five pounds of suspected cocaine, three pounds of heroin, and one firearm.  TRUONG was subsequently arrested for drug and firearm related offenses.

94. Agents sent the crystal methamphetamine, cocaine, and heroin seized from TRUONG at 6671 Hillsdale on September 16, 2023, to a DEA laboratory for analysis. The substances were later confirmed to be methamphetamine, cocaine, and heroin. The crystal methamphetamine had a net weight of 13,744.6 grams.  The cocaine had a net weight of 1,420.69 grams.  The heroin had a net weight of 2,421.2 grams.

### November 1, 2023 – CS-1 purchased approximately four pounds of crystal methamphetamine from HUTCHISON

95. On October 31, 2023, at the direction of agents, CS-1 placed a recorded phone call to HUTCHISON at telephone number (279) 237-0821 (Prior Telephone #4).  During the call, CS-1 stated, "…i'm gonna be down there tomorrow, imma be at you probably around the afternoon time" (in reference to CS-1 wanting to see HUTCHISON the following day to purchase crystal methamphetamine) and HUTCHISON responded, "it's all good I'm waiting on you."  A short time later, CS-1 received a text message from HUTCHISON from Prior Telephone #4 which read, "Give me a call before u head out here bro its good."  Agents subsequently monitored the call and text message responses.

96. On November 1, 2023, at approximately 1:45 p.m., at the direction of agents, CS-1 placed multiple recorded phone calls to HUTCHISON on Prior Telephone #4.  Agents observed CS-1 enter the phone number and place the calls; agents subsequently monitored each of the calls.

97. During these calls, CS-1 told HUTCHISON that CS-1 would be in "Sac" (Sacramento) in thirty minutes and that CS-1 wanted to grab "three of those" (in reference to three pounds of crystal methamphetamine).  HUTCHISON responded, "aight, yup."  CS-1 asked HUTCHISON, "same spot by Carl's jr?" and HUTCHISON stated, "let me hit you back and tell you where to go."  A short time later, CS-1 received a text message from HUTCHISON from Prior Telephone #4 which read, "3501 truxel rd 9583 (in reference to where HUTCHISON wanted to meet CS-1).  This address was identified as an In-N-Out.

98. At approximately 2:26 p.m. on November 1, 2023, CS-1 received a text message from HUTCHISON from Prior Telephone #4 which read, "You there?" and CS-1 responded, "Almost there fam."

99.  At approximately 2:46 p.m., CS-1 arrived in the In-N-Out parking lot.  A short time later, CS-1 placed a recorded phone call to HUTCHISON on Prior Telephone #4.  During this call, CS-1 asked HUTCHISON, "where you at?" and HUTCHISON responded, "give me like twenty minutes… I'm just right here making it out," (meaning HUTCHISON was weighing the crystal methamphetamine).

100.  At approximately 3:24 p.m., CS-1 received a call from HUTCHISON from Prior Telephone #4.  During this call, HUTCHISON asked CS-1 if CS-1 had a "scale" and CS-1 stated, "I do not."  HUTCHISON then said, "my scale fucking just died on me right now, I only just got two's."  CS-1 responded, "oh, you only have two right now?" (meaning two pounds of crystal methamphetamine) and HUTCHISON stated, "I got four of them though, but they in two's... you know what I am talking about?" (in reference to HUTCHISON's supply being packaged in kilogram quantities).  CS-1 told HUTCHISON that CS-1 only needed "three of them" (in reference to three pounds of crystal methamphetamine) and HUTCHISON said, "I know, I can't split any of them right now."  HUTCHISON then asked CS-1 if CS-1 could purchase a scale and CS-1 told HUTCHISON that CS-1 was going to try to find one.

101.  At approximately 3:26 p.m. on November 1, at the direction of agents, CS-1 placed a recorded phone call to HUTCHISON on Prior Telephone #4.  During this call, CS-1 told HUTCHISON, "you can slide me four and I can bring you back some cash on the other whole one" (asking HUTCHISON if he could front CS-1 an additional pound and that CS-1 would pay HUTCHISON back at a later date).  HUTCHISON responded, "for sure though, brotha?" and CS-1 said, "yeah, for sure, 100%, I'll be back to see you." HUTCHISON then stated, "it's good for sure then. I'll be there right now."  Agents subsequently reviewed the audio recordings of these calls and confirmed the details of the conversations.

102.  At approximately 3:45 p.m., agents observed a black Tesla sedan park directly next to CS-1's vehicle.  Agents observed the driver of the Tesla sedan exit the vehicle carrying a white bag and enter the CS-1 vehicle through the right front passenger door.  Agents then observed a Hispanic male juvenile ("J.A.") exit CS-1's vehicle, re-enter the Tesla sedan, and depart the In-N-Out parking lot. Following the controlled purchase, CS-1 told agents that a Hispanic male juvenile entered CS-1's vehicle while carrying a white bag.  TFO Torres showed CS-1 a Sacramento County Juvenile booking photograph of J.A. (16-year-old male) for identification purposes; the photograph did not contain any identifying information.  CS-1 positively identified the Hispanic male juvenile as J.A. CS-1 stated that CS-1 paid J.A. $4,050 in exchange for the four pounds of crystal methamphetamine. CS-1 told J.A. that CS-1 would pay HUTCHISON for the extra

pound of crystal methamphetamine in the upcoming week.  Agents subsequently reviewed the audio recording of the buy and confirmed CS-1's description of events.

103. Agents followed the Tesla sedan as it made its way to the vicinity of John Glenn Way, in Sacramento.  The Tesla sedan parked beside a park, right behind a black Honda Accord, bearing California license plate 8LBR382.  Agents observed J.A. exit the Tesla sedan and enter the Honda Accord through the right front passenger door.  A short time later, agents observed J.A. exit the Honda Accord and re-enter the Tesla sedan which then departed the area.  Agents briefly followed the Honda Accord and positively identified HUTCHISON as the driver and sole occupant of the vehicle.

104. Agents sent the drugs sold by the SARABIA DTO through a Hispanic juvenile male as supervised by HUTCHISON on November 1 to a DEA laboratory for analysis.  The DEA lab later confirmed that the substance a net weight of 1,789.6 grams of methamphetamine.

### November 7, 2023 –CS-1 paid HUTCHISON the remainder of the cost of the four pounds of crystal methamphetamine owed from the November 1 deal

105. On November 6, 2023, at the direction of agents, CS-1 placed a recorded phone call to HUTCHISON on Prior Telephone #4.  During this call, CS-1 stated, "I got that dough for you man, I'll be in town tomorrow" (in reference to the $1,350 owed to HUTCHISON for the extra pound of crystal methamphetamine that HUTCHISON provided to CS-1 on November 1, 2023).  HUTCHISON responded, "all good, I'm waiting on you."  Agents subsequently monitored the call.

106. On November 7, 2023, at approximately 1:31 p.m., at the direction of agents, CS-1 placed multiple recorded phone calls to HUTCHISON over Prior Telephone #4.  Agents observed CS-1 enter the phone number and place the calls; agents subsequently monitored each of the calls.

107. During these calls, CS-1 stated, "I'll be out there probably in like thirty minutes or so… you wanna meet at that same little spot?"  HUTCHISON responded, "there's an In-N-Out right of Del Paso, right when you get out here." (in reference to where HUTCHISON wanted to meet CS-1, the In-N-Out, located at 2900 Del Paso Road in Sacramento).  CS-1 stated, "yup, Del Paso Road, I know where that one is at… I'll hit you when I get there."  HUTCHISON then stated, "aight."

108. At approximately 2:00 p.m., CS-1 arrived in the In-N-Out parking lot.  A short time later, agents observed HUTCHISON arrive in a black Honda Accord, bearing California

license plate 8LBR382, and park directly next to CS-1's vehicle. Agents observed CS-1 exit CS-1's vehicle, walk to the driver side of the Honda Accord, interact verbally with HUTCHISON, hand HUTCHISON the $1,350, then walk back to CS-1's vehicle. Agents observed HUTCHISON depart the In-N-Out parking lot after the meeting ended.

### January 16, 2024 – CS-1 purchased approximately five pounds of crystal methamphetamine from HUTCHISON

109. On January 2, 2024, the Honorable Carolyn K. Delaney authorized activation of GPS "ping" intercepts on telephone number (916) 606-2247 (**TARGET TELEPHONE 1**).

110. On January 10, 2024, at the direction of agents, CS-1 placed a recorded phone call to HUTCHISON over **TARGET TELEPHONE 1**. Agents were able to monitor the call and confirm that the telephone dialed was **TARGET TELEPHONE 1** because the recorded phone calls are recorded on a secure law enforcement server.

111. During this call, CS-1 told HUTCHISON that CS-1 was hoping to see HUTCHISON the following week. CS-1 then asked HUTCHISON, "you good with five?" (in reference to CS-1 wanting to purchase five pounds of crystal methamphetamine). HUTCHISON responded, "hell yeah, it's good, you already know… it's more than good" (meaning that HUTCHISON would have five pounds of crystal methamphetamine available). CS-1 then asked HUTCHISON if he would sell CS-1 the five pounds of crystal methamphetamine for "five flat" ($5,000) and HUTCHISON said "fifty cents on each one" (meaning that HUTCHISON would sell the CS-1 a pound of crystal methamphetamine for $1,050 for a total of $5,250 for five pounds). CS-1 and HUTCHISON agreed on that price and a future drug deal.

112. On January 15, 2024, at the direction of agents, CS-1 placed a recorded phone call to HUTCHISON over **TARGET TELEPHONE 1**. Agents were able to instantaneously monitor the call and confirm that the telephone dialed was **TARGET TELEPHONE 1** because the recorded phone call was recorded on a secure law enforcement server.

113. During this call, CS-1 told HUTCHISON that CS-1 was going to be in town the following day at around 2 or 3 p.m. (for the drug deal that CS-1 and HUTCHISON arranged on January 10). HUTCHISON said, "it's all good, I'm waiting on you." CS-1 then stated, "as soon as I slide into town I'll hit you" and HUTCHISON stated, "aight, bet."

114. On January 16, 2024, at the direction of agents, CS-1 placed a recorded phone call to HUTCHISON over **TARGET TELEPHONE 1**. Agents observed CS-1 enter the phone

number and place the call; agents subsequently monitored the call. During this call, CS-1 asked HUTCHISON if he wanted to meet CS-1 at the "In-N-Out off of Del Paso Road, the same spot?" and HUTCHISON responded, "uh, let me call you right back and tell you exactly where we are gonna meet at." CS-1 then told HUTCHISON that CS-1 was heading to the In-N-Out because he had to go to "Yuba" (Yuba County) right after and HUTCHISON responded, "alright, for sure." CS-1 and HUTCHISON agreed to conduct the transaction in the In-N-Out parking lot, located at 2900 Del Paso Road in Sacramento.

115. At approximately 1:55 p.m., GPS pings from **TARGET TELEPHONE 1** showed that **TARGET TELEPHONE 1** was in the vicinity of the Irongate Apartments, located at 3301 Arena Boulevard, in Sacramento.[9]  Agents then established surveillance in the area of the Irongate Apartments and also the In-N-Out parking lot.

116. At approximately 2:42 p.m., a separate DEA Confidential Source (hereafter referred to as "CS-3")[10] drove CS-1 in CS-1's vehicle to the agreed upon meet location. CS-1 and CS-3 arrived in the In-N-Out parking lot a short time later with agents observing their movements in anticipation of the drug deal.

117. At approximately 2:49 p.m., agents observed a female adult, later identified as Mulan KEOPHIMANH, and HUTCHISON exiting the vicinity of apartment #100. Agents observed KEOPHIMANH and HUTCHISON walk to a gray 2023 Toyota Camry, bearing California license plate 9HLR414,[11] parked in a designated spot within the apartment complex. Agents observed KEOPHIMANH enter the driver's seat and HUTCHISON enter the right front passenger seat of the Toyota Camry. Agents observed the Toyota Camry depart the apartment complex immediately thereafter.

118. At approximately 2:57 p.m., GPS pings from **TARGET TELEPHONE 1** indicated that **TARGET TELEPHONE 1** was travelling east on I-80 near Norwood Avenue. At

---

[9]    Agents had previously determined that 3301 Arena Boulevard was HUTCHISON's residence using authorized GPS "pings" and physical surveillance. However, it was not until the conclusion of the controlled purchase on January 16, 2024, that agents were able to confirm the specific apartment number where HUTCHISON was living.

[10]    CS-3 is currently working with law enforcement for monetary compensation. CS-3 has no known prior criminal convictions. I am not aware of CS-3 providing false or misleading information during this investigation. For these reasons, I believe CS-3 to be reliable in this case.

[11]    The DMV registration information for the gray 2023 Toyota Camry, bearing California license plate 9HLR414, listed Vongthanousone Sanethavong at 2970 Frigate Bird Drive, Sacramento, CA.

approximately 3:11 p.m., GPS pings from **TARGET TELEPHONE 1** showed that **TARGET TELEPHONE 1** was at 3633 Dayton Street, in Sacramento, within a 28-meter accuracy.

119. At approximately 3:29 p.m., agents observed the Toyota Camry arrive in the In-N-Out parking lot and park directly next to CS-1's vehicle. Agents observed HUTCHISON exit the Toyota Camry and enter CS-1's vehicle through the rear driver side door. Agents observed HUTCHISON exit CS-1's vehicle and lean into the Toyota Camry. Agents then observed HUTCHISON re-enter CS-1's vehicle through the rear driver side door. Agents then observed HUTCHISON exit CS-1's vehicle, return to the Toyota Camry, and depart the In-N-Out parking lot.

120. After the controlled purchase, CS-1 told agents that HUTCHISON entered CS-1's vehicle while carrying a red backpack. CS-1 stated that CS-1 counted $5,300 and handed it over to HUTCHISON. CS-1 stated that HUTCHISON took out a white bag containing the crystal methamphetamine from the red backpack and placed it on the rear passenger seat. CS-1 stated that HUTCHISON then exited CS-1's vehicle to retrieve change ($50) for CS-1 before re-entering CS-1's vehicle and handing over $50 in cash to CS-1.

121. Agents followed the Toyota Camry and subsequently observed it arrive at the Irongate Apartments. Agents observed the Toyota Camry park in the same parking stall within the apartment complex. Agents further observed KEOPHIMANH and HUTCHISON exit the Toyota Camry and walk towards apartment #100. Immediately thereafter, agents observed a 2016 Honda Accord, bearing California license plate 8CPV723, arrive and park in close proximity of apartment #100. Agents observed Julio SARABIA exit the Honda Accord and meet up with KEOPHIMANH and HUTCHISON. Agents then observed KEOPHIMANH, HUTCHISON, and SARABIA enter apartment #100.

122. The timing of SARABIA's arrival after HUTCHISON and KEOPHIMANH completed the drug deal with CS-1 is consistent with SARABIA arriving to collect his portion of the drug money from HUTCHISON because HUTCHISON had, at that point, been successful in selling drugs that SARABIA likely provided to HUTCHISON either on credit or as part of their ongoing drug trafficking partnership.

123. Agents submitted the substance purchased from the SARABIA DTO through HUTCHISON on January 16, 2024, to a DEA laboratory for analysis. The DEA lab confirmed the substance contained a net weight of 2,228 grams of methamphetamine.

29

**Wiretap Investigative Phase – HUTCHISON used TARGET TELEPHONE 1 to conduct drug trafficking business with multiple SARABIA DTO members, including SARABIA**

124.    On February 12, 2024, the Honorable Troy L. Nunley authorized the interception of wire and electronic communication over **TARGET TELEPHONE 1**.  DEA began interceptions on February 13, 2024.

125.    The intercepted calls and text messages described below occurred in English. Throughout this Affidavit, I have relied primarily on the transcriptions of contract monitors, as well as in some instances on summaries of calls prepared by the monitors. The summaries are offered based upon the interpretations of investigators based upon the totality of the investigation and information gathered about how the SARABIA DTO operates.

126.    On February 15, 2024, at approximately 7:49 p.m., HUTCHISON made an outgoing call over **TARGET TELEPHONE 1** to 916-370-0563 ("SARABIA Prior Telephone #1"), later identified as being used by SARABIA through physical surveillance.  During this intercepted call, SARABIA asked HUTCHISON, "Do you have some little bit of bread at home?"  HUTCHISON then responded, "Yeah."  SARABIA then said, "Alright," and later asked, "where do you want me to meet you at in a minute?"  HUTCHISON responded, "Pull up to the house right now." SARABIA then stated, "Alright, give me like forty-five minutes though."

127.    Based on my training and experience and participation in this investigation, I know that the word "bread" is often used by drug traffickers as code for money or drug proceeds. Based on this intercepted call and experience with this investigation, I believe that SARABIA called HUTCHISON to collect money ("bread") from the sale of drugs.  It is worth noting that although SARABIA and HUTCHISON did not know they were being wiretapped, they still used coded language to communicate about their criminal activities. Their coded language is shared and did not require additional explanation or clarification when they engaged in this type of communication during the wiretap.  This underscores their trust within the high-risk world of drug trafficking and their ongoing partnership in drug trafficking.

128.    On February 16, 2024, at approximately 5:56 p.m., HUTCHISON made an outgoing call over **TARGET TELEPHONE 1** to SARABIA Prior Telephone #1.  During this intercepted call, HUTCHISON stated that he had just saw "Lino" at the car wash. SARABIA stated that "Claudine" told him (SARABIA) that "Lino" had the "the blues, the thirties, the real ones."  I believe the two men are referring to fentanyl-laced tablets

30

made to look like "M-30" Oxycodone tablets.  SARABIA explains that "Lino" was keeping this (the M-30 pills) hidden from SARABIA.  This intercepted call is an example of the close relationship of mutual trust between SARABIA and HUTCHISON.  In this call, HUTCHISON provided information to SARABIA about another drug trafficker ("Lino") and his behavior in concealing from SARABIA that "Lino" had access to fentanyl-laced pills for distribution.

129.  Later in the call, SARABIA mentioned that he had just talked to "them" (an unknown third party) and that "they" are going to drive out there the 20th.  HUTCHISON then asked, "she didn't need a ride out there no more?" to which SARABIA stated that the "daughter" is going to take "her."

130.  On February 17, 2024, at approximately 4:36 p.m., HUTCHISON received an incoming call over **TARGET TELEPHONE 1** from 707-655-6658, used by Michael HUTCHISON Jr, identified as HUTCHISON's father.  During this intercepted call, HUTCHISON Jr told HUTCHISON that "Michelle wants to talk to you real quick;" in the background a female voice could then be heard saying, "no just ask him." HUTCHISON Jr then stated "Um, anyways, she has somebody that wants to get a 'P' of white," which I believe is in reference to a pound of crystal methamphetamine.  HUTCHISON Jr then stated that "Vincent said thirteen" ($1,300) and then asked, "is he taxing on us or what?"  HUTCHISON responded, "I can give it to her for a little better than that."  HUTCHISON Jr then responded, "She said how much?"  HUTCHISON then stated, "Uh, tell her she can give me eleven" ($1,100).

131.  Based on this intercepted call, I believe that HUTCHISON Jr was inquiring about the cost of a pound of crystal methamphetamine.

132.  A short time later, HUTCHISON placed an outgoing call from **TARGET TELEPHONE 1** to SARABIA Prior Telephone #1.  During this intercepted call, HUTCHISON told SARABIA, "I need some food, hey I need to grab some food," which I believe is a reference to drugs.  SARABIA said, "you know where to go."  HUTCHISON then asked SARABIA, "what just call you or, or are you going to give me her number?"  SARABIA advised HUTCHISON: "no just walk up."  Like the call discussed above, the ease with which SARABIA and HUTCHISON communicate in coded terms emphasizes their high level of trust in one another and familiarity with each other while they are engaged in committing serious criminal offenses.

133.  Based on this intercepted call, agents established surveillance in the vicinity of HUTCHISON's residence because agents believed that HUTCHISON was on his way to a stash location where drugs available for distribution were stored.

134. At approximately 5:17 p.m., HUTCHISON placed an outgoing call from **TARGET TELEPHONE 1** to SARABIA Prior Telephone #1. During this intercepted call, HUTCHISON told SARABIA, "I just seen this nigga again." SARABIA then asked "the same nigga?" HUTCHISON stated "and he was following us again." HUTCHISON later stated, "At the light, bitch, on god I'm going left to go to the freeway. Bitch, on god, he's coming from across. They came from across, bitch. On god, bitch and I turned left and she turns right. On god, he's playing with me now, bitch. We hop on the freeway, bitch, on god I get off on Garden Highway, I go right, bitch on god. Bitch, she gets off and goes right, I flipped it on her, on god. [U/I] and keeps going but he started hitting his brakes." SARABIA later directed HUTCHISON to "Pull up on his bitch ass. Pull up on him and be like 'I know you watching me, nigga,'" HUTCHISON said, "hell no." SARABIA later advised HUTCHISON, "Yeah, don't go there, bro," which agents believe is a reference to the stash location where HUTCHISON was going to pick up "food" (drugs). HUTCHISON then agreed by stating, "I'm not, for sure not, brother." SARABIA then told HUTCHISON, "we gotta chill, bitch." HUTCHISON responded "Yeah, we gotta get out of this car." SARABIA then reiterated, "We gotta chill, bitch. They know the spots." HUTCHISON later stated, "Gotta go put those bitches away, brotha," which I believe is a reference to drugs being removed and placed elsewhere in order to avoid the drugs being seized by law enforcement. HUTCHISON later stated "It's the car or that thing that I'm telling you. They probably don't even need that bitch like this good. They got GPS," which I believe is a reference to a GPS vehicle tracker, and then SARABIA agreed stating, "Yup."

135. Based upon this intercepted call and experience with this investigation, I believe that HUTCHISON was aware of surveillance, was on high alert, and was under the impression that his vehicle was equipped with a GPS tracker and/or police were conducting surveillance of him. This call also demonstrates how HUTCHISON and SARABIA keep each other apprised of outside threats to the SARABIA DTO, including detection or infiltration by law enforcement.

### February 22, 2024 – CS-4 purchased approximately two pounds of crystal methamphetamine from SARABIA DTO member Jose HERNANDEZ

136. On February 7, 2024, the Honorable Allison Claire authorized the activation of GPS "ping" intercepts on telephone number (916) 968-6729, used by Jose HERNANDEZ.

137.   On February 21, 2024, at the direction of agents, CS-4[12] placed a recorded call to HERNANDEZ on telephone number (916) 968-6729.  During the call, CS-4 mentioned that CS-4 wanted to meet Jose HERNANDEZ the next day to purchase two pounds of crystal methamphetamine.  Jose HERNANDEZ agreed and quoted a price of $2,400 for the two pounds of crystal methamphetamine.

138.   On February 22, 2024, at approximately 10:20 a.m., the authorized GPS "ping" on (916) 968-6729 indicated that Jose HERNANDEZ was 2710 Edgewater Court, West Sacramento, California.  This is the known residence for Jose HERNANDEZ.[13]  Agents then established surveillance in the vicinity of Jose HERNANDEZ's residence.

139.   At approximately 11:06 a.m., agents observed Jose HERNANDEZ's Jeep Cherokee (CA 9GER788) exit from within the garage and depart the residence.  Agents maintained constant surveillance of the vehicle as it travelled.

140.   At approximately 11:25 a.m., agents observed the Jeep Cherokee arrive at 3160 Del Paso Road in Sacramento and park on the street in front of the residence. Agents then observed Jose HERNANDEZ exit the Jeep Cherokee and enter a motorhome stored in the front yard of the property. Agents then observed Jose HERNANDEZ exit the motorhome carrying an unknown item, re-enter the vehicle, and depart the area.  Agents maintained constant surveillance of the vehicle as it travelled.

141.   At approximately 12:07 p.m., at the direction of agents, CS-4 placed a recorded call to Jose HERNANDEZ.  During the call, Jose HERNANDEZ and CS-4 agreed to conduct the drug deal at the Natomas Marketplace shopping center, located at 3661 Truxel Road in Sacramento.

---

[12]      CS-4 is cooperating with the DEA SDO Task Force in hopes of receiving monetary compensation. CS-4 has no pending criminal cases but does have a prior criminal history, which includes conspiracy to distribute crystal methamphetamine, possession of a controlled substance for sale, possession of a controlled substance, illegal entry into the U.S., and false identification to a peace officer.  CS-4 does not have a history of providing false information in this case.  For these reasons, I consider CS-4 to be truthful and reliable in this case.

[13]      Agents had previously determined that 2710 Edgewater Court was Jose HERNANDEZ's residence using authorized GPS "pings" and physical surveillance. Furthermore, inquiries from commercial databases indicated that Destiny HUTCHISON was associated with this address. Destiny HUTCHISON is Jose HERNANDEZ's girlfriend with whom he also has a child and, in turn, Destiny HUTCHISON is Michael HUTCHISON's sister.

142. At approximately 12:22 p.m., agents observed the Jeep Cherokee arrive at 1448 Tradewinds Avenue and park in the driveway of the residence. Agents then observed Jose HERNANDEZ exit the Jeep Cherokee, walk towards the attached residence at the back, and enter the attached residence through the front door. This specific unit was later confirmed to be 1448 Tradewinds Avenue unit B. A short time later, agents observed Jose HERNANDEZ exit the residence, re-enter the Jeep Cherokee, and depart the area.

143. At approximately 12:27 p.m., CS-4 drove to the Natomas Marketplace shopping center and parked CS-4's vehicle on the northeast side of the lot.

144. At approximately 12:40 p.m., at the direction of agents, CS-4 placed a recorded call to Jose HERNANDEZ. During the call, CS-4 informed Jose HERNANDEZ that he/she was parked by the Ross store. Agents then observed Jose HERNANDEZ arrive in the Jeep Cherokee. Agents observed Jose HERNANDEZ park the Jeep Cherokee in front of CS-4's vehicle. Agents then observed Jose HERNANDEZ exit the Jeep Cherokee and enter CS-4's vehicle through the front passenger door.

145. At approximately 12:43 p.m., agents observed HERNANDEZ exit CS-4's vehicle, re-enter the Jeep Cherokee, and depart the area.

146. After the controlled purchase, CS-4 told agents that Jose HERNANDEZ arrived and parked directly in front of CS-4's vehicle. CS-4 stated that Jose HERNANDEZ entered CS-4's vehicle through the front passenger door. Upon entering, CS-4 said Jose HERNANDEZ removed two heat sealed plastic bags from the front of his pants and handed them to CS-4. CS-4 stated that s/he then gave Jose HERNANDEZ the $2,400 for the crystal methamphetamine.

147. Agents submitted the substance purchased from Jose HERNANDEZ and the SARABIA DTO on February 22, 2024, to a DEA laboratory for analysis. The DEA lab later confirmed it contained a net weight of 895.90 grams of methamphetamine.

148. Authorized GPS "pings" and vehicle tracker data for Jose HERNANDEZ, HUTCHISON, and SARABIA showed numerous stops at 1448 Tradewinds Avenue. All of these stops were very brief, lasting only a few minutes, mirroring the observations made by agents during the controlled purchase with CS-4 (as detailed above).

**February 24, 2024 – HUTCHISON intercepted and surveilled selling methamphetamine supplied by Jose HERNANDEZ**

149. On February 24, 2024, at approximately 7:05 p.m., HUTCHISON received an incoming call on **TARGET TELEPHONE 1** from 530-443-6889, used by Tanrya Matter.  During this intercepted call, Matter asked, "what's the prices looking like?"  HUTCHISON responded that he would sell her a "whole one," which I believe is reference to a pound of crystal methamphetamine, for "11" ($1,100).  HUTCHISON and Matter agreed to meet off "Truxel" (Truxel Road), and Matter was instructed to leave her residence in 20–25 minutes.

150. A short time later, HUTCHISON received an incoming call on **TARGET TELEPHONE 1** from Matter.  During this intercepted call, Matter asked HUTCHISON if it was okay for her to leave, and HUTCHISON said go ahead but mentioned that he had to meet "somebody" first.  Matter then said that she only wanted "half," which I believe is reference to a half pound of crystal methamphetamine, and not a "whole one."

151. At approximately 8:54 p.m., authorized GPS tracker data on Jose HERNANDEZ's brown Jeep Cherokee (CA 9GER788) showed it arriving at HUTCHISON's residence.  Before that, the GPS tracker revealed a quick stop at 1448 Tradewinds Avenue in Sacramento.  At approximately 9:00 p.m., the GPS tracker indicated that the Jeep Cherokee had departed from HUTCHISON's residence.  HUTCHISON then placed an outgoing call to 530-443-6889, used by Tanrya Matter.  During this intercepted call, HUTCHISON informed Matter that he was one exit away.  Matter mentioned that she was parked by the Ross store in a silver Volvo.

152. Based on this information, agents established surveillance in the Ross parking lot and observed the Jeep Cherokee arrive.  HUTCHISON got out of the front passenger seat, met with Matter, and returned back to the Jeep Cherokee.  The Jeep Cherokee left the parking lot immediately, and the GPS tracker showed it travelling back to HUTCHISON's residence.

153. Based on this intercepted call, experience with this investigation, and surveillance observations, I believe that HERNANDEZ supplied HUTCHISON with the half pound of crystal methamphetamine, which HUTCHISON then sold to Matter.  Furthermore, I believe that HERNANDEZ picked up the half pound of crystal methamphetamine from 1448 Tradewinds Avenue based upon his travel movements, as recorded by the GPS data and the sequence of intercepted calls in the timeline leading to HUTCHISON's drug deal with Matter.

**February 25, 2024 – Intercepted calls and surveillance reveal HUTCHISON sold a pound of methamphetamine to Guadalupe CERVANTES**

154. On February 25, 2024, at approximately 4:03 p.m., HUTCHISON placed an outgoing call on **TARGET TELEPHONE 1** to 279-245-4261, used by Guadalupe CERVANTES. During the intercepted call, CERVANTES told HUTCHISON that he wanted a "whole one," which I believe is a reference to a pound of crystal methamphetamine. HUTCHISON agreed and directed CERVANTES to meet him off of "Northgate" (Northgate Boulevard).

155. Authorized GPS tracker data for HERNANDEZ's Jeep Cherokee showed the vehicle leaving HERNANDEZ's residence a short time after the call described above. At approximately 4:18 p.m., the GPS tracker indicated that the Jeep Cherokee stopped at the Sprouts Farmers Market parking lot, located at 4408 Del Rio Road in Sacramento. Around the same time, the authorized GPS "ping" on **TARGET TELEPHONE 1** also indicated that HUTCHISON was present in the Sprouts Farmers Market parking lot. Subsequent to HUTCHISON's arrival, the GPS tracker showed that the Jeep Cherokee drove to 1448 Tradewinds Avenue (approximately 0.8 miles away), and then quickly returned back to the parking lot for a brief period.

156. A short time later, the GPS "ping" on **TARGET TELEPHONE 1** indicated that HUTCHISON had relocated to the 524 Mexican Restaurant, located at 3830 Northgate Boulevard, while the GPS tracker indicated that the Jeep Cherokee had returned to HERNANDEZ's residence.

157. No additional calls were intercepted between CERVANTES and HUTCHISON and it is unknown if HUTCHISON and CERVANTES met to carry out the deal for the pound of crystal methamphetamine. Based on this intercepted call, experience with this investigation, the GPS tracker data, and my training and experience, I believe that HERNANDEZ picked up a pound of crystal methamphetamine from 1448 Tradewinds Avenue and then supplied it to HUTCHISON in the Sprouts Farmers Market parking lot.

**February 28, 2024 – HUTCHISON used TARGET TELEPHONE 1 to facilitate the sale of three pounds of methamphetamine to CS-1**

158. On February 2, 2024, the Honorable Deborah Barnes authorized activation of GPS "ping" intercepts on **TARGET TELEPHONE 1**.

159. On February 27, 2024, at the direction of agents, CS-1 placed a recorded phone call to HUTCHISON over **TARGET TELEPHONE 1**. Agents were able to instantaneously

monitor the call and confirm that the telephone dialed was **TARGET TELEPHONE 1** because CS-1's phone calls are recorded on a secure law enforcement server.

160. During this call, CS-1 told HUTCHISON that CS-1 was hoping to see him the next day to purchase three to four pounds of crystal methamphetamine and HUTCHISON said, "it's all good, for sure." HUTCHISON mentioned that he also had "smurfs" (fentanyl-laced pills made to look like "M-30" Oxycodone tablets) available. HUTCHISON described the "smurfs" as "nice as fuck" and "lovely" (indicating good quality). HUTCHISON quoted CS-1 a price of "12" ($1,200) per "boat" (1,000 "M-30" tablets).

161. On February 28, 2024, at approximately 6:26 p.m., at the direction of agents, CS-1 placed a recorded phone call to HUTCHISON over **TARGET TELEPHONE 1**. Agents observed CS-1 enter the phone number and place the call; agents subsequently monitored the call. During this call, CS-1 told HUTCHISON that he was heading to Sacramento and needed three pounds of crystal methamphetamine. HUTCHISON agreed and mentioned that he was waiting on his "boy" to get home.

162. A short time later, at the direction of agents, CS-1 placed multiple recorded phone calls to HUTCHISON over **TARGET TELEPHONE 1**. Agents observed CS-1 enter the phone number and place the call; agents subsequently monitored each of these calls. During these calls, HUTCHISON confirmed that he obtained the three pounds of crystal methamphetamine. HUTCHISON mentioned that he needed to meet another person off of "Marconi" (Marconi Avenue). HUTCHISON and CS-1 then agreed to conduct the transaction in the Home Depot parking lot, located at 8000 Folsom Boulevard in Sacramento.

163. At approximately 9:11 p.m., CS-1 arrived at the Home Depot parking lot and parked on the northwest side of the lot, as observed by agents.

164. At approximately 9:20 p.m., agents observed HERNANDEZ's Jeep Cherokee arrive in the Home Depot parking lot and park directly next to CS-1's vehicle. Agents observed HUTCHISON exit the right front passenger door of the Jeep Cherokee and enter CS-1's vehicle. Agents then observed HUTCHISON exit CS-1's vehicle, return to the Jeep Cherokee, and depart the Home Depot parking lot.

165. After the controlled purchase, CS-1 told agents that HUTCHISON entered CS-1's vehicle through the right front passenger door. Upon entering CS-1's vehicle, CS-1 stated that HUTCHISON removed three plastic bags containing crystal methamphetamine from his front sweatshirt pocket and placed them on the center console. CS-1 then handed HUTCHISON $3,300 in exchange for the crystal methamphetamine.

166. Agents submitted the substance purchased from HUTCHISON as part of the SARABIA DTO on February 28, 2024, to a DEA laboratory for analysis. The DEA lab later confirmed that the substance contained a net weight of 1,344.60 grams of methamphetamine.

**<u>March 3, 2024 – HUTCHISON used TARGET TELEPHONE 1 to facilitate the sale of 1,500 fentanyl-laced pills made to look like "M-30" Oxycodone tablets</u>**

167. On March 1, 2024, the Honorable Deborah Barnes authorized activation of GPS "ping" intercepts on **TARGET TELEPHONE 1**.

168. On March 3, 2024, at approximately 12:13 p.m., at the direction of agents, CS-1 sent a text message to HUTCHISON on **TARGET TELEPHONE 1**, which read, "Yo fam gonna be in town today need them baby blues." Later that day, HUTCHISON sent a text message from **TARGET TELEPHONE 1** to CS-1, which read, "Ight fasho let me know when."

169. At approximately 6:35 p.m., communications were intercepted over **TARGET TELEPHONE 1** with 279-245-4261, used by Guadalupe CERVANTES. During those intercepted communications, CERVANTES asked HUTCHISON for "four of them," which I believe is reference to four pounds of crystal methamphetamine. HUTCHISON replied, "hell yeah," and informed CERVANTES that he had to go grab it.

170. At approximately 6:45 p.m., the authorized GPS "ping" on **TARGET TELEPHONE 1** indicated that HUTCHISON was in the vicinity of N Street and Interstate-5 in Sacramento.

171. At approximately 6:55 p.m., TFO Kacalek reviewed the live pole camera for 616 N Street in Sacramento and observed HUTCHISON along with two other individuals exit the residence.

172. At approximately 7:13 p.m., at the direction of agents, CS-1 placed multiple recorded phone calls to HUTCHISON over **TARGET TELEPHONE 1**. Agents observed CS-1 enter the phone number and place the calls; agents subsequently monitored the calls.

173. During these calls, HUTCHISON agreed to sell 1,500 fentanyl-laced pills made to look like "M-30" Oxycodone tablets for $1,700. HUTCHISON informed CS-1 that he still needed to retrieve "them" (M-30 tablets). HUTCHISON and CS-1 agreed to conduct the transaction at the In-N-Out, located at 3501 Truxel Road in Sacramento.

174. At approximately 7:15 p.m., the authorized GPS "ping" on **TARGET TELEPHONE 1** indicated that HUTCHISON was in the vicinity of Price Court and Rio Linda Boulevard. The "ping" encompassed the address of 2765 Rio Linda Boulevard.

175. At approximately 7:22 p.m., communications were intercepted over **TARGET TELEPHONE 1** with CERVANTES. During those intercepted communications, HUTCHISON informed CERVANTES to meet him near the intersection of Arden Way and Fairfield (Fairfield Street), which is an approximate five-minute drive from 2765 Rio Linda Boulevard. A short time later, agents observed HUTCHISON's Toyota Camry meet with a Cadillac sedan, bearing California license plate 8YJD152,[14] near the intersection of Arden Way and Fairfield Street. Though agents were not able to confirm CERVANTES was the driver of the Cadillac sedan, I believe that CERVANTES was the driver of the vehicle, because the wire intercepts revealed that HUTCHISON was directing CERVANTES to meet at the intersection of Arden Way and Fairfield Street, where surveillance subsequently observed HUTCHISON meet with the Cadillac sedan.

176. At approximately 7:36 p.m., CS-1 received an incoming call from HUTCHISON. During this call, HUTCHISON informed CS-1 that he needed to retrieve the "key" to get to the "spot" (stash location). Subsequent to this conversation, agents lost visual of the Toyota Camry that HUTCHISON was driving and were unable to acquire the vehicle. GPS ping data was not able to provide locational data to confirm HUTCHISON's path of travel after making this comment to CS-1 over the call.

177. At approximately 8:02 p.m., CS-1 arrived at the In-N-Out parking lot and parked just south of the restaurant, as observed by agents. A short time later, agents observed the Toyota Camry arrive and park next to CS-1's vehicle. Agents observed HUTCHISON exit the driver's seat of the Toyota Camry and enter CS-1's vehicle. Approximately two minutes later, agents observed HUTCHISON exit CS-1's vehicle, return to the Toyota Camry, and depart the In-N-Out parking lot.

178. After the controlled purchase, CS-1 told agents that HUTCHISON entered CS-1's vehicle through the right front passenger door. Upon entering CS-1's vehicle, CS-1 stated that HUTCHISON removed two plastic bags containing "M-30" tablets from his front sweatshirt pocket and handed them to CS-1. CS-1 then handed HUTCHISON $1,700 in exchange for the "M-30" tablets.

---

[14] The registration information on the Cadillac sedan, bearing California license plate 8YJD152, returned to Raymond Silas 5764 Nina Way Apt #2, Sacramento, CA, 95824.

179. Agents submitted the "M-30" tablets purchased from HUTCHISON on behalf of the
SARABIA DTO to a DEA laboratory for analysis. The DEA lab determined that the "M-30" tablets contained a net weight of 160.33 grams of fentanyl.

**March 12, 2024 – Surveillance of SARABIA and HUTCHISON, followed by a traffic stop results in the seizure of one pound of crystal methamphetamine**

180. On March 12, 2024, at approximately 8:56 p.m., agents initiated surveillance on a 2023 Nissan Rogue, bearing California license plate 9HCG380,[15] in the Elk Grove area. Agents observed SARABIA driving the Nissan Rogue and HUTCHISON in the rear passenger seat of the vehicle. Agents also observed that there were other occupants in the Nissan Rogue. Agents followed the Nissan Rogue as it traveled throughout Elk Grove, making several brief stops along the way.

181. At approximately 9:39 p.m., agents observed the Nissan Rogue arriving in the area of New Country Drive in Elk Grove. Agents observed an unidentified truck begin to follow the Nissan Rogue for a few seconds before both vehicles parked on New Country Court. Agents observed an unidentified individual exit the rear passenger seat of the Nissan Rogue, approach the right front passenger door of the truck, briefly lean into the truck, and then return to the Nissan Rogue, which then left the area. The truck also departed the area in a different direction. Agents continue to surveil the Nissan Rogue.

182. At approximately 10:03 p.m., agents observed the Nissan Rogue arriving at 2765 Price Court on Sacramento. Agents observed the Nissan Rogue come to a stop in front of the residence, and an unidentified individual exit the Nissan Rogue and walk towards the residence. The Nissan Rogue then repositioned and parked in front of the residence. Agents observed SARABIA exit the Nissan Rogue and walk toward the residence. Agents observed the unidentified individual exit the residence and get into the Nissan Rogue. A few seconds later, agents observed SARABIA also exit the residence and get into the driver seat of the Nissan Rogue. The vehicle then left the area, and agents continued to surveil it.

183. At approximately 10:27 p.m., agents observed the Nissan Rogue arrive in the area of 6120 Oak Green Circle in Carmichael and park in front of the residence. Agents then observed a separate vehicle, later identified as a black 2001 Mercedes S430, bearing California license plate 5RXP715, also arrive and stop just short of the Nissan Rogue. Agents observed an unidentified individual approach and open the right front passenger seat of the Mercedes S340, where the unidentified individual met with the occupants

---

[15]    The Nissan Rogue, bearing California license plate 9HCG380, is a rental car registered to EAN Holdings LLC, 14002 E. 21st Street St., Suite 1500, Tulsa, OK 74134.

inside.  Approximately one minute later, the unidentified individual walked back towards the Nissan Rogue, and the vehicle left the area.  Due to visual obstructions, agents were unable to confirm if the unidentified individual came from the Nissan Rogue and/or got back into the Nissan Rogue before it left the area.

184. Based on the suspicion that a drug deal had occurred between the Nissan Rogue and the Mercedes S430, agents coordinated a traffic stop on the Mercedes S430.  Agents followed the Mercedes S430 as it left the area of Oak Green Circle and traveled south on Walnut Avenue.  At approximately 10:50 p.m., a CHP marked patrol vehicle conducted a traffic stop on the Mercedes S430 on Walnut Avenue based upon an observed violation of the California Vehicle Code.  Upon yielding to the CHP officer, a male individual, later identified as Thomas Wood, opened the front passenger door and ran northbound, away from the CHP officer.  Wood was taken into custody shortly thereafter by another CHP officer. The driver of the Mercedes S430 was identified as Brooke Clark.  Upon approaching the Mercedes S430, the CHP officer observed a large plastic bag containing suspected crystal methamphetamine on the right front passenger seat in plain view.  A search of Clark revealed two plastic bags containing suspected crystal methamphetamine.  Clark and Wood were subsequently arrested for drug related offenses and booked into the Sacramento County jail.

185. Based on my training, experience, and knowledge of this investigation, coupled with surveillance observations, I believe that the crystal methamphetamine located in the Mercedes S430 was supplied by SARABIA during the drug deal observed by agents before the traffic stop.

186. The crystal methamphetamine is in the process of being submitted to a DEA laboratory for analysis.  Based on my training and experience, and that of other experienced agents, I believe the substance to be crystal methamphetamine.  The crystal methamphetamine had a gross weight of 582.7 gross grams.

**March 13, 2024 – Mulan KEOPHIMANH made a suspected money drop run to Southern California, and a firearm was located during a search of her vehicle**

187. On February 26, 2024, the Honorable Jeremy D. Peterson authorized GPS "ping" intercepts on telephone number (279) 386-9399, used by KEOPHIMANH, for a period of 30 days.

188. On March 13, 2024, at approximately 7:35 p.m., ping data for KEOPHIMANH indicated that the phone left KEOPHIMANH and HUTCHISON's shared residence and began traveling southbound on Interstate 5.  Between approximately 11:17 a.m. and 11:47 a.m.,

ping data showed the phone in the vicinity of Hardt Field, located at 9001 Stockdale Highway in Bakersfield. At approximately 12:17 p.m., ping data showed the phone traveling northbound on Interstate 5. At approximately 2:00 p.m., agents established surveillance on Interstate 5 just south of Tracy.

189. At approximately 2:22 p.m., using the ping information, agents located KEOPHIMANH driving northbound on Interstate 5 in the same 2023 Nissan Rogue (CA 9HCG380) that SARABIA was observed driving on March 12, 2024.

190. Agents followed the Nissan Rogue as it continued to travel northbound on Interstate 5 towards Stockton. At approximately 3:08 p.m., a marked CHP patrol vehicle conducted a traffic stop on the Nissan Rogue on Interstate 5 in Stockton based upon an observed violation of the California Vehicle Code. The officer identified KEOPHIMANH as the driver and sole occupant. Another officer deployed his controlled substance detection canine to perform a cursory search of the vehicle. The canine unit alerted to the presence of narcotics in the vehicle. A subsequent search yielded a loaded semi-automatic Glock handgun (#BVVH164) in a Louis Vuitton backpack style purse. The magazine was loaded with 13 rounds. The officer also located KEOPHIMANH's cell phone and a wallet containing multiple cards with KEOPHIMANH's name on it within the same Louis Vuitton backpack style purse. KEOPHIMANH was subsequently arrested for firearm-related offenses and booked into the San Joaquin County jail.

191. A review of authorized GPS "ping" information for SARABIA Prior Telephone #2 revealed that SARABIA had gone to Target Location 1 prior to KEOPHIMANH's departure to southern California.

192. Based on my training, experience, and knowledge of this investigation, I believe that KEOPHIMANH made a quick turnaround trip to southern California at the direction of SARABIA to drop off an unknown amount of currency to his source(s) of supply, either as a payment for a future shipment of drugs or to pay off a drug debt for drugs that were fronted to SARABIA.

### April 2, 2024 – CS-4 purchased approximately three pounds of crystal methamphetamine from Jose HERNANDEZ

193. On March 26, 2024, the Honorable Carolyn K. Delaney authorized activation of GPS "ping" intercepts for telephone number (279) 241-1809, used by Jose HERNANDEZ.

194. On April 1, 2024, at approximately 1:15 p.m., at the direction of agents, CS-4 placed a recorded phone call to HERNANDEZ at telephone number (279) 241-1809. During this

call, CS-4 informed HERNANDEZ that s/he was hoping to see HERNANDEZ the next day.  HERNANDEZ asked, "what you wanna do?" to which CS-4 replied that s/he would let HERNANDEZ know the next day and HERNANDEZ agreed.

195.  At approximately 12:43 p.m., at the direction of agents, CS-4 placed a recorded phone call to HERNANDEZ.  During the call, CS-4 informed HERNANDEZ that s/he wanted "three" (three pounds of crystal methamphetamine).  HERNANDEZ replied that he needed to retrieve it and that it would take about an hour.  HERNANDEZ and CS-4 agreed to conduct the drug deal at the In-N-Out, located at 3501 Truxel Road, in Sacramento.

196.  At approximately 1:25 p.m., agents observed HERNANDEZ exit the garage of 2710 Edgewater Court in West Sacramento while carrying a black backpack.  Agents then observed HERNANDEZ enter the driver seat of a black Dodge Durango that was parked in the driveway of the residence. The Dodge Durango departed the residence and agents maintained constant surveillance of the vehicle as it travelled.

197.  At approximately 1:42 p.m., agents observed the Dodge Durango stop at a Chevron gas station, located at 860 Arden Way in Sacramento.  Agents observed HERNANDEZ exit the Dodge Durango, walk into the store portion of the gas station, exit the store portion of the gas station, put gas in the vehicle, then depart the gas station.  After departing the Chevron gas station, agents observed the Dodge Durango make a substantial amount of irrational turns into shopping centers and residential neighborhoods, acting in a manner consistent with conducting counter-surveillance to evade law enforcement observation.

198.  At approximately 2:10 p.m., CS-4 arrived at the In-N-Out parking lot and parked just south of the restaurant, as observed by agents.

199.  At approximately 2:18 p.m., agents observed the Dodge Durango park next to CS-4's vehicle.  Agents then observed HERNANDEZ exit the Dodge Durango, walk to CS-4's vehicle, place something in the front passenger seat of CS-4's vehicle, then enter the front passenger side of CS-4's vehicle.  A few seconds later, agents observed HERNANDEZ exit CS-4's vehicle, return to the Dodge Durango, and depart the parking lot.

200.  Agents followed the Dodge Durango and subsequently observed it arrive at the Terracina Gold Apartments at 4451 Gateway Park Blvd, SARABIA's known residence.  This observed pattern of behavior is consistent with the inference that HERNANDEZ delivered a portion of the drug money from the drug deal with CS-4 to SARABIA because SARABIA provided the drugs on credit to HERNANDEZ or as part of their ongoing drug trafficking partnership within the SARABIA DTO.

201. After the controlled purchase, CS-4 told agents that HERNANDEZ entered CS-4's vehicle through the right front passenger door.  Upon entering, CS-4 stated that HERNANDEZ removed a black grocery bag from under his sweatshirt and handed it to CS-4.  CS-4 looked inside the black grocery bag and noted it contained a blue plastic bag further containing bags of crystal methamphetamine.  CS-4 then handed HERNANDEZ the $3,600 in exchange for the crystal methamphetamine.

202. The crystal methamphetamine was submitted to a DEA laboratory for analysis, the results of which are still pending.  Based on my training and experience, and that of other experienced agents, I believe the substance to be crystal methamphetamine.  The crystal methamphetamine had a gross weight of 1463.9 gross grams.

### April 2, 2024 – Surveillance of SARABIA and confirmation of SARABIA's residence

203. On April 2, 2024, at approximately 5:00 p.m., I established surveillance in the vicinity of the Terracina Gold Apartments, located 4451 Gateway Park Boulevard in Sacramento – the known residence of Julio SARABIA.

204. At approximately 6:00 p.m., I observed SARABIA, Selena Torres, and a child exit apartment #318. (Note: Co-Conspirator 1 previously explained that Selena Torres and SARABIA approached Co-Conspirator 1 in approximately January 2023 about transporting loads of drugs for SARABIA – Co-Conspirator 1 believed Torres was involved in SARABIA's drug dealing operation and was in a romantic relationship with him).  I then observed SARABIA re-enter the same apartment briefly before coming out again within a few seconds. SARABIA subsequently met up with Torres and the child, and the three individuals moved towards the parking lot located on the northside of the apartment complex.  All three individuals entered Torres's Acura MDX, displaying California license plate number 9BFV757, and departed from the area.

### April 18, 2024 – Surveillance of HUTCHISON and SARABIA

205. On April 18, 2024, at approximately 5:00 p.m., law enforcement established surveillance in the vicinity of HUTCHISON and KEOPHIMANH's residence located at 3301 Arena Boulevard in Sacramento.

206. At approximately 5:06 p.m., law enforcement observed HUTCHISON and John Martinez exit the residence and enter the Toyota Camry that HUTCHISON was observed driving by agents during the January 16, 2024, and March 3, 2024 controlled purchases with CS-

1. The Toyota Camry departed the residence and law enforcement began to surveil the vehicle.

207. At approximately 5:14 p.m., law enforcement observed the Toyota Camry arrive at 524 Mexican Restaurant, located at 3830 Northgate Boulevard. Law enforcement further observed both Martinez and HUTCHISON exit the Toyota Camry and enter the restaurant. A short time later, law enforcement observed Martinez, HUTCHISON, and a third individual exit the restaurant and walk towards the Toyota Camry. Agents were able to identify the third individual as Julio SARABIA. Martinez, HUTCHISON, and SARABIA entered the Toyota Camry and departed the restaurant. Martinez was driving the Toyota Camry, SARABIA was the front passenger, and HUTCHISON was the rear passenger.

208. Law enforcement followed the Toyota Camry to St. Mary Cemetery, located at 6509 Fruitridge Road. Law enforcement observed Martinez, HUTCHISON, and SARABIA exit the vehicle and visit a headstone within the cemetery. A short time later, Martinez, HUTCHISON, and SARABIA returned to the Toyota Camry and departed the cemetery. Martinez was driving the Toyota Camry, SARABIA was the front passenger, and HUTCHISON was the rear passenger.

209. At approximately 7:15 p.m., law enforcement observed the Toyota Camry arrive at the Burger King, located at 4960 Auburn Boulevard in Sacramento. Law enforcement observed SARABIA exit the Toyota Camry and walk eastbound towards a mobile home park, located at 5000 Auburn Boulevard. SARABIA continued to the far east side of the lot and entered an unknown trailer on the south (the trailer was later identified as Space 38 as discussed in the next section). Due to an obstructed view, law enforcement could not determine which trailer SARABIA had entered. A short time later, law enforcement observed SARABIA emerge from the unknown trailer on the south side of the lot carrying a weighted plastic grocery bag, and observed him begin walking westbound towards Auburn Boulevard. SARABIA then returned to the Burger King, re-entered the Toyota Camry, and departed the area.

210. At approximately 7:36 p.m., law enforcement observed the Toyota Camry arrive at 272 Christine Drive. Law enforcement observed SARABIA exit the Toyota Camry with the weighted plastic grocery bag in his hands, walk towards the front door of 272 Christine Drive, and go into the residence. Approximately ten minutes later, law enforcement observed SARABIA exit 272 Christine Drive without the weighted plastic grocery bag, re-enter the Toyota Camry, and depart the area.

211. Based on my training, experience, and knowledge with this investigation, I believe that the unknown trailer at 5000 Auburn Boulevard (later identified as Space 38 as discussed in the next section) is a stash location for the SARABIA DTO. Furthermore, I believe that SARABIA retrieved a significant amount of drugs from this location and subsequently delivered them to 272 Christine Drive.

212. Law enforcement followed the Toyota Camry and observed it park near 2388 Oakmont Street. Law enforcement observed HUTCHISON exit the rear passenger seat of the Toyota Camry and walk into 2388 Oakmont Street. A short time later, law enforcement observed HUTCHISON exit 2388 Oakmont Street, re-enter the Toyota Camry, and depart the area. The surveillance operation was then terminated.

**Identification of suspected stash location at 5000 Auburn Boulevard, Space 38, Sacramento**

213. I later reviewed the aerial footage captured by the Sacramento County Sheriff's Office airwing during the surveillance operation involving Martinez, HUTCHISON, and SARABIA on April 18, 2024 (described immediately above). While reviewing the footage, with particular focus on the time period when SARABIA arrived at the mobile home park, I observed SARABIA standing at the front door of the trailer in Space 38. SARABIA knocked on the door, entered the trailer, and closed the door behind him.

214. After a few minutes, SARABIA emerged from the vicinity of the trailer in Space 38 carrying a weighted bag. Due to the positioning of the airwing, I was unable to observe SARABIA exit the trailer in Space 38. A commercial database query revealed that the person residing at the location has a criminal history that includes two drug-related crimes.

215. On April 29, 2024, the Honorable Jeremy D. Peterson authorized activation of GPS "ping" intercepts for telephone number (279) 241-1641, used by Jose HERNANDEZ.

216. On April 30, 2024, at approximately 9:49 p.m., the authorized GPS "ping" indicated that HERNANDEZ made a brief stop at 5000 Auburn Boulevard, Space 38, in Sacramento, with a 6-meter accuracy.

217. Toll analysis of HERNANDEZ's telephone number (279) 241-1641 revealed that HERNANDEZ and telephone number (916) 834-1666 were in contact approximately 120 times between March 27 and April 24, 2024. A commercial database query revealed that telephone number (916) 834-1666is subscribed to the resident of 5000 Auburn Boulevard Space 38, in Sacramento.

218. Based on this information, coupled with my training, experience, and knowledge of this investigation, I believe that Space 38 is a stash location for the SARABIA DTO, given that members of the SARABIA DTO access this trailer, and SARABIA was observed leaving the trailer with a weighted grocery bag believed to contain drugs.

## April 30, 2024 – Identification of suspected stash location at 3160 Del Paso Boulevard, in Sacramento

219. On April 30, 2024, at approximately 2:19 p.m., the authorized GPS "ping" for Jose HERNANDEZ's phone indicated that HERNANDEZ was at 3160 Del Paso Boulevard in Sacramento. I reviewed the live pole came footage for this location and observed a red sedan arrive and park on the street in front of the residence. I observed HERNANDEZ exit the red sedan and walk towards the front of the property. Due to the angle of the pole camera, I was unable to observe HERNANDEZ enter the residence or access a motorhome stored in the front yard.

220. At approximately 2:24 p.m., HERNANDEZ reappeared from the property and began walking back to the red sedan. I zoomed in and noticed that HERNANDEZ was carrying a weighted white bag in his left hand. HERNANDEZ re-entered the red sedan and departed the area.

221. Based on my observations, coupled with the fact that HERNANDEZ was observed making a brief stop at this location and departing with an unknown item prior to the controlled purchase with CS-4 on February 22, 2024 (as detailed above), I believe that 3160 Del Paso Boulevard in Sacramento is another stash location for the SARABIA DTO. Furthermore, based on my training, experience, and knowledge of this investigation, I know that drug traffickers often times have multiple stash locations. This precaution is taken so that if one of their locations is compromised and located by law enforcement, they would only lose a portion of their product.

## May 1, 2024 – Law enforcement observe Jose HERNANDEZ engaged in a drug deal

222. On May 1, 2024, at approximately 3:19 p.m., the authorized GPS "ping" indicated that HERNANDEZ was back at 3160 Del Paso Boulevard in Sacramento. Upon reviewing the live pole camera for this location, I observed the same red sedan arrive and park on the street behind an older blue sedan that was already parked in front of the residence at approximately 3:10 p.m. A short time later, I observed an individual exit the blue sedan and approach the driver's side window of the red sedan. After a brief exchange, I observed the individual move along the eastside of the motorhome stored in the front

yard and towards the front of the residence, out of camera view. Within a minute, the individual reappeared from the residence, carrying a white bag. I observed the individual return to the driver's side window of the red sedan and hand the white bag to the driver. The individual then returned to the blue sedan, entered the vehicle, and departed the area. A short time later, the red sedan also departed. Based on the GPS pings from HERNANDEZ's phone and the movement of the red sedan, I believe that HERNANDEZ was the driver of the red sedan and that the individual supplied HERNANDEZ with an unknown quantity of drugs.

223.   At approximately 7:59 p.m. on May 1, the authorized GPS "ping" indicated that HERNANDEZ was again back at 3160 Del Paso Boulevard in Sacramento. Upon reviewing the live pole camera for this location, I observed a newer silver Chevrolet SUV arrive and park on the street in front of the residence at approximately 7:54 p.m. Approximately one minute later, I observed HERNANDEZ exit the Chevrolet SUV through the rear passenger side of the vehicle.

224.   At approximately 7:56 p.m., I observed HERNANDEZ enter the motorhome stored in the front yard. Within seconds, the driver exited the Chevrolet SUV and walked around towards the rear passenger side of the vehicle. A short time later, I observed HERNANDEZ exit the motorhome, walk back to the Chevrolet SUV, and open the front passenger door. It appeared that HERNANDEZ was talking to the individual seated in the front passenger seat.

225.   At approximately 7:57 p.m., I observed HERNANDEZ close the front passenger door and re-enter the motorhome. I also observed the driver of the Chevrolet SUV get back into the driver's seat. At approximately 8:04 p.m., I observed HERNANDEZ exit the motorhome carrying a white plastic bag. I then observed HERNANDEZ enter the Chevrolet SUV through the rear passenger door with the white plastic bag and depart the area.

**April 30, 2024 – Intercepted calls between HUTCHISON and Guadalupe CERVANTES about a drug deal – Confirmation of suspected stash location at 616 N Street, Sacramento**

226.   On April 19, 2024, the Honorable Troy L. Nunley authorized the interception of wire and electronic communication over HUTCHISON's telephone, (530) 575-2921 ("**TARGET TELEPHONE 3**"). Interception began on April 20, 2024.

227.   On March 26, 2024, the Honorable Carolyn K. Delaney authorized activation of GPS "ping" intercepts for **TARGET TELEPHONE 3**.

228. On April 30, 2024, at approximately 6:12 p.m., HUTCHISON received an incoming call on **TARGET TELEPHONE 3** from 279-245-4261, used by Guadalupe CERVANTES. During this intercepted call, HUTCHISON asked, "What ya trynna do?" CERVANTES responded, "Same thing." HUTCHISON responded, "Alright it's all good, let me go put it together for you."

229. At approximately 7:49 p.m., HUTCHISON received another incoming call over **TARGET TELEPHONE 3** from CERVANTES. During this intercepted call, HUTCHISON stated, "I'm grabbin' it right now," and later asked "so all you needed is the half, right?" CERVANTES responded, "Yeah for sure."

230. The authorized GPS "ping" indicated that HUTCHISON was in the vicinity of 616 N Street in Sacramento when he received the incoming call. I reviewed the live pole camera for this location and observed HUTCHISON coming out of the rear parking lot of the apartment complex and moving towards the front door of 616 N Street at approximately 7:54 p.m. HUTCHISON was wearing a white t-shirt and dark colored pants. I then observed HUTCHISON enter the residence and close the door behind him.

231. At approximately 8:33 p.m., HUTCHISON placed an outgoing call from **TARGET TELEPHONE 3** to CERVANTES. During this intercepted call, HUTCHISON asked "You can meet me at the Wal-Mart again?" CERVANTES responded, "Uh, yep." HUTCHISON later stated that he had to "stop off uh uh El Camino real quick and then [U/I] straight to you."

232. The authorized GPS "ping" indicated that HUTCHISON was still in the vicinity of 616 N Street when he placed the outgoing call. Upon reviewing the live pole camera for this location, I observed an individual wearing a white t-shirt and dark colored pants exit the residence and move towards the rear parking lot of the apartment complex at approximately 8:41 p.m. I was unable to confirm the individual as HUTCHISON because the video was pixelated at that time. However, at approximately 8:52 p.m., the authorized GPS "ping" indicated that HUTCHISON was in the vicinity of West El Camino and Northgate Boulevard, coinciding with pole camera observations of HUTCHISON leaving 616 N Street, and consistent with HUTCHISON's intercepted call with CERVANTES.

233. At approximately 9:19 p.m., HUTCHISON received another incoming call over **TARGET TELEPHONE 3** from CERVANTES. During this intercepted call, CERVANTES asked, "Where you at?" HUTCHISON responded, "I'm right here nigga…where we met at last time." HUTCHISON then asked, "Where you at? What car

49

you in?"  CERVANTES responded, "In the van."  HUTCHISON responded, "That might be you right…yeah…go uh…go left…or just pull right here to the left right there."

234. Immediately after this series of intercepted calls, agents observed HUTCHISON meet with CERVANTES in the Walmart parking lot located at 4675 Watt Avenue, North Highlands, where HUTCHISON has met CERVANTES on a prior occasion to conduct a drug deal ("meet me at the Wal-Mart again").

235. Based on these intercepted calls and surveillance observations, I believe that HUTCHISON sold CERVANTES a half pound of methamphetamine ("half") and that HUTCHISON acquired the half pound from 616 N Street because HUTCHISON mentioned that he was "grabbin' it right now," while pinging at 616 N Street, and preparing to take drugs to the drug deal with CERVANTES.

236. Queries of a Sacramento County law enforcement database revealed that the individual who resides at 616 N Street is an MBK associate.  TFO Cunningham was familiar with this person and had previously conducted surveillance on him at 616 N Street. TFO Cunningham also knows this person's Instagram social media account is "**nnnn.ick**," and has the caption, "4evaSplazh," in its biography. According to TFO Cunningham, "4evaSplazh" is a tribute to a late MBK member who was murdered execution-style manner in September 2022, in Sacramento.

237. Live pole camera footage along with authorized GPS "pings" and vehicle tracker data, has identified 616 N Street as a place where SARABIA, HUTCHISON, and HERNANDEZ visit regularly.

238. On February 19, 2024, the occupant of 616 N Street was intercepted over **TARGET TELEPHONE 1.** During the intercepted call, he explained to HUTCHISON that he had just been "pressed" (confronted) by "A Peezy," who TFO Cunningham identified as Anthony Pimentel. Also during the intercepted call, Pimentel confronted the 616 N Street resident about something he had posted on social media. HUTCHISON told the 616 N Street resident that he should have had a "thing" (likely a gun) on him to protect himself. HUTCHISON then stated that if he would have seen Pimentel that he would have shot him. The 616 N Street resident said that moving forward he will keep "it" (likely a gun) on him.

## <u>CONCLUSION AND REQUEST TO SEAL</u>

239. This Affidavit contains information regarding potential targets, which if unsealed may jeopardize the very information sought to be gained by these search warrants. In light of the ongoing nature of the investigation, and the likelihood that notice to above-identified individuals may cause them to destroy evidence, flee from prosecution, and notify confederates, I request that this affidavit and the resulting arrest warrants be sealed on the Court's docketing system, with the exception of copies utilized by law enforcement officers participating in the investigation.

240. I also respectfully request that a Criminal Complaint be issued against the defendants listed below and, based upon that Criminal Complaint, arrest warrants be issued for each of the defendants based upon their ongoing violation of federal law, as detailed below.

241. <u>Defendants and Violation</u>

     i.    Between on or about January 26, 2023, and continuing to the present, the defendants Julio Cesar SARABIA, Michael William HUTCHISON III, Jose Miguel HERNANDEZ JR, Mulan Precious KEOPHIMANH, Johnny Bobby TRUONG, Guadalupe Manuel CERVANTES, and Tanya Duerelle LAWSON, are engaged in an ongoing conspiracy with each other and others known and unknown, to distribute and possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1).

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

                                       /s/ Sixto Torres

                                       Sixto Torres
                                       Task Force Officer
                                       Drug Enforcement Administration

Sworn to me over the telephone and SIGNED by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this _____28_____ day of May 2024.

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

Approved as to form:

*/s/ Jason Hitt*
Jason Hitt
Assistant United States Attorney

<u>**United States v. Julio SARABIA, et al.**</u>
**Penalties for Criminal Complaint**

<u>**Defendants**</u>
**Julio Cesar SARABIA**
**Michael William HUTCHISON III**
**Jose Miguel HERNANDEZ JR**
**Mulan Precious KEOPHIMANH**
**Johnny Bobby TRUONG**
**Guadalupe Manuel CERVANTES**
**Tanya Duerelle LAWSON**

**Penalty on Sole Count in the Complaint:**
**ALL DEFENDANTS**

VIOLATION:        21 U.S.C. §§ 846, 841(a)(1) – Conspiracy to Distribute and Possess with
Intent to Distribute at least 500 grams of a mixture and substance
containing a detectable amount of methamphetamine

PENALTIES:        Mandatory minimum of 10 years in prison and a maximum of up to life in
prison; or
Fine of up to $10,000,000; or both fine and imprisonment
Supervised release of at least 5 years up to life

SPECIAL ASSESSMENT: $100 (mandatory)